UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT J. GIUFFRA and MARY GIUFFRA,

Plaintiffs,

v.

VANTAGE TRAVEL SERVICE, INC. d/b/a
VANTAGE DELUXE WORLD TRAVEL,

Defendant.

Civil Action No.: 13-cv-6880 (KBF)

---

**MEMORANDUM OF LAW IN SUPPORT OF VANTAGE TRAVEL SERVICE, INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

**NIXON PEABODY LLP**
*Attorneys for Defendant*
50 Jericho Quadrangle
Suite 300
Jericho, New York 11753
(516) 832-7500

*Of Counsel*
James W. Weller, Esq.
Juan Luis Garcia, Esq.

4812-9066-3201.3

Table of Contents

Page

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.      DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE
UNDISPUTED RECORDS SHOWS PLAINTIFFS CANNOT MAKE OUT A
PRIMA FACIE CASE OF NEGLIGENCE......................................................... 4

    A.    The Essential Elements Of Any Negligence Action ............................... 5

    B.    Courts Have Consistently Rejected Any Duty in Negligence for Travel Agents
And Tour Companies to Investigate or Warn about Harms that May Befall
Travelers, Absent Actual Prior Knowledge ........................................... 6

    C.    The Circumstances and Evidentiary Record in This Case Cannot Support Any
Relevant Legal Duty by Vantage to Investigate the Immediate Vicinity of the
Hotel or to Warn of Obvious Dangers ................................................... 9

    D.    Plaintiffs Cannot Show Any Negligence By Vantage Because Plaintiffs Received
Adequate Warnings, the Tour Guide's Statement Was True, and Vantage
Reasonably Investigated the Reputation of the Hotel ........................... 13

    E.    In Any Case, Plaintiffs Cannot Establish Negligent Acts or Omissions by Vantage
Because Plaintiffs Cannot Demonstrate Any Grounds for Attributing the Riga
Tour Guide's Acts to Vantage ............................................................... 16

    F.    Vantage Is Entitled to Summary Judgment Because Plaintiffs' Admissions Show
the Immediate Vicinity of the Hotel Was Safe and Thus Plaintiffs Cannot Show
Any Actual or Constructive Notice of a Dangerous Condition ............. 18

    G.    Independently, Vantage Is Entitled To Summary Judgment Because Its Terms and
Conditions Apply to Preclude Any Liability for Plaintiffs' Injuries ................... 21

II.     PLAINTIFFS' CLAIM FOR BREACH OF WARRANTY MUST BE
DISMISSED ....................................................................................................... 22

III.    PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY MUST BE
DISMISSED ....................................................................................................... 23

IV.    PLAINTIFF MARY GIUFFRA'S CLAIM FOR LOSS OF SERVICES MUST
BE DISMISSED ................................................................................................. 24

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................4

*Carley v. Theater Dev. Fund*,
22 F. Supp. 2d 224 (S.D.N.Y. 1998)...............................................................6

*Catalano v. NWA, Inc.*,
No. No. PI 98–7768, 1998 WL 777023 (D. Minn. 1998)..........................22

*Dow v. Abercrombie & Kent Intern, Inc.*,
No. 99 C 6923, 2000 WL 688949 (N.D. Ill. May 24, 2000) ...................7

*Fidenas AG v. Honeywell, Inc.*,
501 F. Supp. 1029 (S.D.N.Y. 1980)................................................................4

*Fling v. Hollywood Travel and Tours*,
765 F. Supp. 1302 (N.D. Oh. 1990), *aff'd on op. below,* 933 F.2d 1008 (6th Cir. 1991)
.......................................................................................................... passim

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)..........................................................21

*Gabrielle v. Allegro Resorts Hotels*,
210 F. Supp. 2d 62 (D.R.I. 2002) .................................................................7

*Hassett v. Cape Cod Bicycle Tours, Inc.*,
No. 87-0016-Z, 1987 U.S. Dist. LEXIS 8321, 1987 WL 17540 (D. Mass. Sept. 3, 1987) ............................................................................................................22

*Heidle v. Interval Int'l U.S.A. Corp.*,
2003 U.S. Dist. LEXIS 18505 (W.D.N.Y. Sept. 9, 2003) ...................8, 22

*Hofer v. The Gap, Inc.*,
516 F. Supp. 2d 161 (D. Mass. 2007) ...........................................................6

*Kashfi v. Phibro-Salomon, Inc.*,
628 F. Supp. 727 (S.D.N.Y. 1986) ................................................................4

*Klinghoffer v. S.N.C. Achille Lauro ed Altri-Gestione*,
816 F. Supp. 934 (S.D.N.Y. 1993) ................................................................7

Table of Contents (continued)

Page

*Lachina v. Pacific Best Tour, Inc.*,
  1995 U.S. Dist. LEXIS 20157, 1996 WL 51193 (S.D.N.Y. Feb. 5, 1995)................................8

*Lavine v. General Mills, Inc.*,
  519 F. Supp. 332 (N.D. Ga. 1981) ......................................................................................8, 22

*Loeb v. United States Dep't of Interior*,
  793 F. Supp. 431 (E.D.N.Y. 1992) ................................................................................6, 21, 22

*Lumauig v. Philippine Airlines*,
  624 F. Supp. 238 (S.D.N.Y. 1985) .........................................................................................23

*Manahan v. NWA, Inc.*,
  821 F. Supp. 1105 (D.V.I.), *adh'd to on recons.*, 821 F. Supp. 1110 (D.V.I. 1992),
  *aff'd*, 995 F.2d 218 (3d Cir. 1993) ................................................................................. passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................................................4

*Mayer v. Cornell University*,
  107 F.3d 3, 1997 U.S. App. LEXIS 669 (2d Cir. Jan. 18, 1997), *cert. denied*, 522 U.S.
  818.............................................................................................................................................7

*Passero v. DHC Hotels and Resorts, Inc.*,
  981 F. Supp. 742 (D. Conn. 1996)............................................................................................6

*Petition of Binstock*,
  13 F. Supp. 909 (S.D.N.Y. 1963), *aff'd sub. non., Binstock v. Friedman*, 330 F. 2d
  267 (2d Cir. 1964).....................................................................................................................19

*Raskin v. Ulysses Lines, Ltd.*,
  No. 79 Civ. 4275 (HFW), 1980 U.S. Dist. LEXIS 9363 (S.D.N.Y. Sept. 10, 1980)..............22

*Russell v. Celebrity Cruises, Inc.*,
  96 Civ. 3328 (BSJ), 2000 U.S. Dist. LEXIS 10332 (S.D.N.Y. July 20, 2000) ..................7, 23

*Schwartz v. Hilton Hotels Corp.*,
  639 F. Supp. 2d 467 (D.N.J. 2007) ...........................................................................................8

*Semmelroth v. American Airlines*,
  448 F. Supp. 730 (E.D. Ill. 1978)..............................................................................................7

*Starkey v. Gap Adventures, Inc.*,
  2014 U.S. Dist. Lexis 42461 (S.D.N.Y. Mar. 27, 2014)..........................................................21

*Tillman v. Cont'l Plaza Hotels & Resorts*,
  2000 U.S. Dist. LEXIS 20211, 2000 WL 3325002 (S.D. Tex. Aug. 10, 2000) .......................9

Table of Contents (continued)

Page

*Weg v. Macchiarola*,
   995 F.2d 15 (2d Cir. 1993)....................................................................................4

*Wilson v. American Trans Air., Inc.*,
   874 F.2d 386 (7th Cir. 1989) .............................................................................7

STATE CASES

*Adames v. Trans Nat'l Travel*,
   No. SUCV 9700208B, 1998 WL 1284179 (Mass. Super. Ct. April 10, 1998) .......................6

*Avonov v. Bruins Transportation, Inc.*,
   294 A.D.2d 522, 742 N.Y.2d 389 (2d Dep't 2001) ..............................................21

*Beck v. J.J.A. Holding Corp.*,
   12 A.D.3d 238, 785 N.Y.S.2d 425 (1st Dep't 2004) ............................................19

*Becker v. Schwartz*,
   46 N.Y.2d 401 (1978) ..........................................................................................5

*Buckeridge v. Broadie*,
   5 A.D.3d 298, 774 N.Y.S.2d 132 (1st Dep't 2004) ..............................................18

*Camp v. Loughran*,
   285 A.D.2d 483 (2d Dep't 2001) .........................................................................7

*Dorkin v. Am. Exp. Co.*,
   43 A.D.2d 877, 351 N.Y.S.2d 190 (3d Dep't 1974)...................................... passim

*EBC I v. Goldman Sachs*,
   5 N.Y.3d 11 (2005) .............................................................................................23

*Lauer v. City of New York*,
   95 N.Y.2d 95 (2000) ............................................................................................5

*Maidman v. Stagg*,
   82 A.D.2d 299, 441 N.Y.S.2d 711 (2d Dep't 1981)...........................................24

*Maraia v. Church of Our Lady of Mount Carmel*,
   36 A.D.3d 766, 828 N.Y.S.2d 525 (2d Dep't 2007)..............................................8

*Meshel v. Resorts International of New York, Inc.*,
   160 A.D.2d 211 (1st Dep't 1990) .......................................................................17

*Mongello v. Davos Ski Resort*,
   224 A.D.2d 502 (2d Dep't 1996) .........................................................................6

Table of Contents (continued)

Page

*Sacks v. Loew's Theatres, Inc.*,
  47 Misc. 2d 854, 263 N.Y.S.2d 253 (Spec. Term. Queens Cnty. 1965)..................................10

*Smith v. West Rochelle Travel Agency, Inc.*,
  No. 8412/94, 1996 N.Y. Misc. LEXIS 592 (Sup. Ct. Westchester Cnty. April 10,
  1996*), aff'd*, 238 A.D.2d 398 (2d Dep't 1997) ................................................................17, 21

*Taylor v. Trans World Airlines, Inc.*,
  56 Ohio App. 2d 117, 381 N.E.2d 944 (Oh. C.A., 6th Dist. 1977) ...........................5, 7, 8, 11

*Weiner v. British Overseas Airways Corp.*,
  60 A.D.2d 427, 40 N.Y.S.2d 91 (2d Dep't 1978) ................................................................6, 10

*WIT Holding Corp. v. Klein,*
  724 N.Y.S. 2d 66 (2d Dep't 2001) .........................................................................................23

**RULES**

Fed. R. Civ. P. 56(c) ...............................................................................................................4

**OTHER AUTHORITIES**

85 N.Y. Jur. 2d Premises Liability § 45..................................................................................19

## INTRODUCTION

Plaintiff Robert Giuffra was assaulted and mugged by an unknown individual while traveling in Riga, Latvia on a tour he and his wife purchased from Defendant Vantage Travel Service, Inc. ("Vantage").  Mr. Giuffra suffered extensive injuries at the hands of this unknown assailant.  While this incident was horrible, pickpocketing and muggings can happen anywhere, even in Times Square, New York.  There is no theory of liability that makes a travel packager, such as Vantage, an absolute guarantor against random acts of street crime.  Travel agents, tour packagers and operators are not insurers against all accidents that may befall a tourist anywhere in the world, particularly when, as here, the precise time, place and surrounding circumstances in which Mr. Giuffra might be pickpocketed was impossible to know in advance.  This proposed standard of liability makes no sense and in any event is not the law in New York.[1]

## STATEMENT OF FACTS

Mr. and Mrs. Giuffra ("Plaintiffs" or the "Giuffras") are well-educated and they are seasoned travelers.  They traveled to the Netherlands, Hungary, Greece, and Turkey before they experienced the incident that is the subject of this suit.  (Defendant's Rule 56.1 Statement ["Rule 56.1 Stat."] ¶ 4.)  Since that incident, Plaintiffs have continued to travel, including a recent cruise to Bermuda. (Rule 56.1 Stat. ¶ 5.)

Plaintiffs booked a tour through various Baltic countries, including Latvia, for June through July of 2012.  Plaintiffs received Vantage's terms and conditions, contained both in their invoice and a Tour Participation Agreement.  (Rule 56.1 Stat. ¶¶ 12-17.)  Vantage's terms and conditions expressly indicated that Vantage did not own, operate or control the transportation,

---

[1] While the contract by which the tour was purchased by the Giuffras contains a choice of law provision designating Massachusetts law, defendants have applied New York law as there appears to be no significant differences between New York and Massachusetts law on the relevant issues.

excursions and hotel accommodations Vantage had reserved for Plaintiffs or the individuals, such as tour guides, that provide such services:

> Vantage organizes, promotes and sells tour programs consisting of certain travel services, including surface, air and water transportation, sightseeing excursions, and cruise/hotel accommodations, that Vantage purchases or reserves from various suppliers (collectively 'Suppliers'). Vantage does not own or operate these Suppliers.

(Declaration of Alicia Guevara ["Guevara Decl."] Ex. 1 at VANTAGE 000043.)  Accordingly, Vantage undertook no warranties or responsibility for the acts of its independent suppliers abroad and expressly excluded or disclaimed any such warranty or responsibility:

> The Suppliers providing travel services for Vantage's tour programs are independent contractors, and are not agents or employees of Vantage.  As such, Vantage is not responsible for direct, indirect, consequential, or incidental damage, injury, loss, accident, delay, or irregularity of any kind occasioned by reason of any act or omission beyond its control, including, without limitation, any negligent or willful act or failure to act of, or breach of contract by, any Supplier or any other third party.

(*Id.*)  These terms also excluded any liability for criminal acts.  "Nor is Vantage responsible for . . . criminal activities . . . ."  (*Id.*)

Plaintiffs are both highly educated and Mary Giuffra specifically acknowledged in her deposition that she received the invoice which contained, on the reverse side, these Terms and Conditions prior to their trip.  (Rule 56.1 Stat. ¶ 12.)  While he denied reading any of these documents, Mr. Giuffra, a long standing member of the New York bar, must have understood that he was bound by the terms under which the tour was purchased.

Plaintiffs also received written and oral warnings regarding the risks and dangers of robberies and pickpocketing, while on tour.  Plaintiffs received travel documents with the following warning:

- 2 -

> Please keep in mind that in any tourist destination, you need to be aware of your surroundings… Although incidents of theft and pickpocketing while on tour are rare, it is important to be cautious and aware.

(Declaration of James Weller ["Weller Decl."] Ex. 7 at 30.) Plaintiffs also acknowledged in their depositions that their tour guide orally advised them that they should be careful while out and about on the public streets of Riga, Latvia and other Baltic States. (Rule 56.1 Stat. ¶ 39.) They understood that the warning indicated a risk or danger of pickpocketing and robberies. (*Id.*)

On the afternoon of July 14, 2012, Plaintiffs and three (3) companions left their hotel, the four-star Radisson Blu Daugava, which is across a scenic river from the "Old Town" of Riga, Latvia, to have dinner on "free time" and explore the "Old Town" on their own. Plaintiffs allege that an independent tour guide indicated that walking to the "Old Town" was safe, and in particular that a stone bridge leading from the "Old Town" of Riga was safe.

When Plaintiffs and their companions finished having dinner, they decided to walk back to their hotel. It is not disputed that the hotel made available a van for transportation to and from the hotel and Riga had taxis and public transportation available. (Rule 56.1 Stat. ¶ 41.) Mrs. Giuffra noted in her deposition that her preference would have been to take a taxi, but they decided to walk because their companions were relatively young and strong and wanted to walk. (Rule 56.1 Stat. ¶ 42.) To return to the hotel, Plaintiffs and their companions crossed a stone bridge. Upon leaving the bridge on the side nearer the hotel, rather than taking another, longer route at street-level, they descended to a pedestrian pathway (or short tunnel) below the street-level. (Rule 56.1 Stat. ¶¶ 44-45.) On the tunnel stairs, Mr. Giuffra encountered a pickpocket. Mr. Giuffra could see his wallet being removed and pushed the assailant, who pushed him back. Mr. Giuffra fell down the stairs suffering several fractures and other injuries. (*Id.*)

- 3 -

As a result of his injuries, Plaintiffs have sued Vantage under various theories of negligence, breach of warranty, breach of fiduciary duty, and loss of consortium.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the defendant has established a *prima facie* showing that it is entitled to summary judgment, the plaintiff can only avoid summary judgment by setting forth "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993).  The plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory allegations without factual support are insufficient to defeat a motion for summary judgment.  *Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727, 731 (S.D.N.Y. 1986).  Nor can plaintiff rely on "frivolous or immaterial factual issues" in an attempt to defeat defendant's motion.  *Fidenas AG v. Honeywell, Inc.*, 501 F. Supp. 1029, 1033 (S.D.N.Y. 1980) (citing *Williams v. McAllister Brothers, Inc.*, 534 F.2d 19 (2d Cir. 1976)).

## I.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED RECORDS SHOWS PLAINTIFFS CANNOT MAKE OUT A PRIMA FACIE CASE OF NEGLIGENCE

Plaintiff was the unfortunate victim of a random act of street crime in the public streets of Riga, Latvia.  Plaintiffs' negligence claim rests on the contention that the area where Robert Giuffra was attacked, an area within the vicinity of the Radisson Blu Daugava hotel, was not "safe," that Vantage knew or should have known that it was unsafe, and that an independent tour guide's purported statement that the bridge was safe was not accurate.

- 4 -

The undisputed facts establish that the Giuffras were seasoned travelers and that they were warned both in writing and orally that street crime such as pickpocketing could occur on tour.  The law of negligence does not provide a remedy against a mere tour packager, such as Vantage, for what occurred in the public streets of Latvia.  *See, e.g., Manahan v. NWA, Inc.*, 821 F. Supp. 1105 (D.V.I.) (tour operator had no liability for plaintiffs' assault which occurred outside hotel arranged by it despite alleged statement by a tour representative at the hotel that the path was safe), *adh'd to on recons.,* 821 F. Supp. 1110 (D.V.I. 1992), *aff'd*, 995 F.2d 218 (3d Cir. 1993); *Fling v. Hollywood Travel and Tours*, 765 F. Supp. 1302 (N.D. Oh. 1990) (tour operator had no liability for plaintiffs' injuries during robbery that occurred 200 yards from hotel arranged by it), *aff'd on op. below,* 933 F.2d 1008 (6th Cir. 1991); *Taylor v. Trans World Airlines, Inc.*, 56 Ohio App. 2d 117, 381 N.E.2d 944 (Oh. C.A., 6th Dist. 1977) (defendant had no liability for plaintiff's loss from a purse snatching that occurred in public streets of Rome).

Simply put, negligence requires some degree of fault or blame, and Plaintiffs cannot point to any negligent or blameworthy action or inaction by Vantage that caused Plaintiffs' robbery and assault.  Accordingly, this Court must dismiss Plaintiffs' claims against Vantage. Any contrary decision holding Plaintiffs' claims viable would impose a kind of strict liability against tour packagers and travel agents for *any* type of harm that may befall a traveler.

A.     The Essential Elements Of Any Negligence Action

To state a *prima facie* of negligence, a plaintiff must plead and offer sufficient evidence in admissible form to support a jury's finding as to each of the following elements: (1) duty; (2) breach of duty; (3) proximate causation; and (4) damages.  *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978).  The failure to make the required showing on even just one those elements requires dismissal (whether at summary judgment or at trial) on the basis that plaintiff has failed to state a *prima facie* case of negligence.  *See Lauer v. City of New York*, 95 N.Y.2d 95, 100 (2000) (duty

is an essential element of any negligence action without which the action founders).  As described below, Plaintiffs' negligence claims must be dismissed because Vantage did not have any relevant duty regarding the robbery and assault that Plaintiffs suffered at the hands of an unknown assailant and Vantage did not act negligently in selecting and booking Plaintiffs' tour.

B.    Courts Have Consistently Rejected Any Duty for Travel Agents And Tour Companies to Investigate or Warn about Harms that May Befall Travelers, Absent Actual Prior Knowledge

Courts throughout the United States have examined negligence principles in the context of personal injury lawsuits brought by tour participants who are physically hurt while traveling, and have consistently rejected any affirmative duty by travel agents or tour companies to protect or warn travelers about dangers in travel destinations.  These reported cases feature various fact patterns that include tour participants who have suffered serious physical injuries, including death, as a result of;  slips or falls over various dangerous conditions,[2] malfunction of a hotel window,[3] a defective rental vehicle,[4] unsafe operation of a tour bus,[5] dangerous activities in which tour representatives were present,[6] snorkeling expedition in which tour representatives

---

[2] *See, e.g.*, *Mongello v. Davos Ski Resort*, 224 A.D.2d 502, 502 (2d Dep't 1996) (defendant sponsor of a ski weekend had no legal duty with regard to decedent's death as a result of an alleged dangerous condition or negligence at the ski resort); *Hofer v. The Gap, Inc*., 516 F. Supp. 2d 161 (D. Mass. 2007) (Expedia which visited and rated hotel in question had no duty or liability for plaintiff's fall from stair well with no railing); *Loeb v. United States Dep't of Interior*, 793 F. Supp. 431, 437-39 (E.D.N.Y. 1992) (tour operator could not be liable for injury traveler suffered while walking near her lodge in a national park); *Passero v. DHC Hotels and Resorts, Inc*., 981 F. Supp. 742 (D. Conn. 1996) (tour operator and travel agent had no liability for plaintiff's tripping over a pool mat at hotel).

[3] *Carley v. Theater Dev. Fund*, 22 F. Supp. 2d 224, 227-28 (S.D.N.Y. 1998) (travel tour packager had no liability or duty regarding plaintiff's injury which resulted from trying to open the hotel windows).

[4] *Weiner v. British Overseas Airways Corp*., 60 A.D.2d 427, 433, 40 N.Y.S.2d 91 (2d Dep't 1978) (tour operator had no relevant duty to inspect rental automobiles or insure passengers' safety).

[5] *Dorkin v. Am. Exp. Co*., 43 A.D.2d 877, 351 N.Y.S.2d 190 (3d Dep't 1974) (tour packager had no duty with respect to plaintiff's injuries sustained when a tour bus braked abruptly).

[6] *Adames v. Trans Nat'l Travel*, No. SUCV 9700208B, 1998 WL 1284179 (Mass. Super. Ct. April 10, 1998) (though defendant tour operator/packager advertised independent optional game activities in Cancun and had employees present, it had no duty or liability with regard to plaintiff's injuries sustained during those activities).

- 6 -

were present,[7] contraction of disease,[8] criminal robberies and assaults inside hotels or camp sites booked by a travel agent,[9] terrorist hijackings and murders abroad,[10] and, as here, robberies or criminal assaults on the public streets of a travel destination. *Manahan*, 821 F. Supp. 1105; *Fling*, 765 F. Supp. 1302; *Taylor*, 56 Ohio App. 2d 117, 381 N.E.2d 944. These tour participants, like the Plaintiffs, have sought to reallocate responsibility to tour operators, packagers and travel agents, as insurers of allegedly hazardous conditions encountered during trips abroad. However, courts have consistently rejected imposing expansive insurer-like liability on persons having only a fortuitous and remote connection with the plaintiffs.

As a matter of law, travel agents and tour packagers like Vantage have no legal duty to investigate and warn about dangerous conditions and hazards on properties they do not own or control, particularly so on public streets. "Under New York law, tour companies and travel agents … owe no duty to tour members to inform them of possible hazardous conditions on the

---

[7] *Mayer v. Cornell University*, 107 F.3d 3 (Table), 1997 U.S. App. LEXIS 669 (2d Cir. Jan. 18, 1997) (Cornell University, which had sponsored a group tour that included a snorkeling expedition of Costa Rica and had an employee present, did not have any liability or relevant duty to take any affirmative act to prevent injury to the decedent), *cert. denied*, 522 U.S. 818.

[8] *Russell v. Celebrity Cruises, Inc.*, 96 Civ. 3328 (BSJ), 2000 U.S. Dist. LEXIS 10332 (S.D.N.Y. July 20, 2000) (travel agent which had merely booked cruise had no duty regarding plaintiff's contraction of Legionnaire's disease aboard cruise ship).

[9] *See, e.g.*, *Wilson v. American Trans Air., Inc.*, 874 F.2d 386 (7th Cir. 1989) (tour operator had no liability for attempted rape that occurred at the hotel arranged through it); *Camp v. Loughran*, 285 A.D.2d 483 (2d Dep't 2001) (hotel and tour packager had no liability for injuries suffered as a result of sexual assault by other trip participants that occurred during the defendants' sponsored event that included open bars); *Dow v. Abercrombie & Kent Intern, Inc.*, No. 99 C 6923, 2000 WL 688949 (N.D. Ill. May 24, 2000) (tour operator had no liability for injuries plaintiffs suffered in Kenya when their group was attacked and robbed by bandits while sleeping at camp site that was part of the safari excursion arranged by defendant); *Gabrielle v. Allegro Resorts Hotels*, 210 F. Supp. 2d 62, 69 (D.R.I. 2002) (plaintiff's theory of liability against a travel agent defendant, for injuries sustained as a result of a criminal robbery and assault in a hotel resort booked through the travel agent, was so lacking in legal merit that it amounted to fraudulent joinder and thus did not defeat federal diversity jurisdiction).

[10] *See, e.g.*, *Klinghoffer v. S.N.C. Achille Lauro ed Altri-Gestione*, 816 F. Supp. 934, 936 (S.D.N.Y. 1993) (tour operator and cruise line had no liability for injuries suffered as a result of terrorist high-jacking of the cruise ship, because defendants had no actual or constructive knowledge that security measures were inadequate); *Semmelroth v. American Airlines*, 448 F. Supp. 730 (E.D. Ill. 1978) (owner of airline and hotels which induced decedent to travel to Mexico in an expense-paid trip had no liability for murder that occurred during the trip outside premises of its hotels, despite alleged knowledge that the location was "overrun by armed bandits of guerrillas").

property of others." *Heidle v. Interval Int'l U.S.A. Corp.,* 2003 U.S. Dist. LEXIS 18505, *9-10

(W.D.N.Y. Sept. 9, 2003) (surveying New York law as articulated by state and federal courts);

*see also Maraia v. Church of Our Lady of Mount Carmel*, 36 A.D.3d 766, 767, 828 N.Y.S.2d

525, 526 (2d Dep't 2007) (reciting the same legal rule); *Lachina v. Pacific Best Tour, Inc.*, 1995

U.S. Dist. LEXIS 20157, 1996 WL 51193, at *1 (S.D.N.Y. Feb. 5, 1995) (same).

This rule of non-liability for tour operators, even those whose agents or representatives

accompany a plaintiff during tour, is particularly clear in the case of patent or obvious risks and

hazards.  Courts have universally recognized that a tour operator has no obligation to warn a tour

participant of such obvious and patent risks as an uncovered manhole,[11] slippery rocks on a

beach,[12] and, as in this case, purse-snatchings or robberies.[13]  These well-reasoned precedents

and authorities decidedly preclude any liability against Vantage to warn of such an obvious risk

as pickpocketing.

The New York courts' grounds for rejecting a legal duty in circumstances like this case

are sound.  Travel agents and tour packagers offer "hundreds of tours all over the world" and

"cannot be charged with the duty" to foresee the various accidents that befall tour participants.

*Lachina*, 1995 U.S. Dist. LEXIS 20157, 1996 WL 51193, *3-4 (applying New York law).  A

travel agent "is not an insurer, nor can he be reasonably expected to divine and forewarn of an

innumerable litany of tragedies and dangers inherent in foreign travel." *Schwartz v. Hilton Hotels

Corp.*, 639 F. Supp. 2d 467, 474 (D.N.J. 2007) (applying New Jersey law but looking to New

York law for guidance); *see also Heidle*, 2003 U.S. Dist. LEXIS 18505, at *11 (noting that a tour

---

[11]  *Lachina v. Pacific Best Tour, Inc.*, 1995 U.S. Dist. LEXIS 20157, *2-*4 (S.D.N.Y. Feb. 5, 1995) (plaintiff fell into uncovered manhole while traversing the tarmac at Chong Quing Airport in China).

[12]  *Lavine v. General Mills, Inc.*, 519 F. Supp. 332, 334 (N.D. Ga. 1981) (plaintiff fell on dangerously slippery rocks on beach in Fiji).

[13]  *Manahan*, 821 F. Supp. 1105; *Fling*, 765 F. Supp. 1302;  *Taylor*, 56 Ohio App. 2d 117, 381 N.E.2d 944.

promoter "had no duty to follow plaintiff to her destination to inspect her rental car" and that

such a duty "'would entail a feat of legal legerdemain in no way supported by logic, reason,

business custom or precedent.'" (quoting *Weiner*, 60 A.D.2d at 433, 401 N.Y.S.2d at 95-96)).

Because a travel agent is a "broker of services" and not "guarantors of the happiness or safety of

the tourists [to] whom they sell tickets" there is no basis to impose any duty to investigate and

warn "in the absence of *actual knowledge* of the specific [hazardous] condition and the

probability of the tourist being affected by it." *Tillman v. Cont'l Plaza Hotels & Resorts*, 2000

U.S. Dist. LEXIS 20211, 2000 WL 3325002, at *1-4 (S.D. Tex. Aug. 10, 2000) (emphasis

added) (discussing, *inter alia*, New York law).

  C. <u>The Circumstances and Evidentiary Record in This Case Cannot Support A Legal Duty by Vantage to Investigate the Immediate Vicinity of the Hotel or to Warn of Obvious Dangers</u>

  In circumstances that are most analogous to the facts here, courts have decidedly held

that a travel agent or tour operator has no duty to investigate or warn about specific criminal

dangers on the public streets of a travel destination.  For example, in *Manahan*, 821 F. Supp.

1105, the court rejected a remarkably similar theory of liability.  The plaintiff and a friend had

traveled to St. Thomas in a tour arranged through the defendants, one of whom had a direct

employee at the hotel and elsewhere on the tour as a tour guide.  *Id*. at 1106.  The plaintiff was

attacked by a criminal assailant who had tried to snatch her purse while she was walking at night

on a public sidewalk, near the hotel, as a result of which she suffered serious physical injuries.

*Id.*  The plaintiff claimed she had walked at night because of advice she received from a direct

representative and employee of one defendant.  *Id*. at 1107.  The representative had allegedly

told the plaintiff that walking to and from a particular restaurant that was near the hotel would be

safe and the path well-lit.  *Id*. at 1109.  Even considering a hotel's heightened duty of care (the

hotel was one of the defendants), the court concluded that no defendant owed any relevant duty of care with regard to plaintiff's criminal assault.

The *Manahan* court carefully addressed all material facts of the case.  The court noted that the defendants' representative's statement could not reasonably have been understood as a guarantee that no harm would befall the plaintiff.  At best, it could only be understood to mean that in the representative's experience, "there had been no prior instances of physical attacks upon tourists or others who had traveled the route at night, or in the day" and she did not know of any other specific dangers to plaintiff's walking the route.  821 F. Supp. at 1109.  It was of course material that the attack had occurred outside the hotel and all defendants' control, since no reasonable security measures could have restrained or prevented the attack.  *Id.*  It was also material, as it is here, that none of the defendants had any actual notice or knowledge of any incidents of assaults "within the immediate vicinity of the hotel."  *Id.*  The court rejected anecdotal and generalized evidence of crime, including from a supposed expert about the crime precinct that indicated the hotel was in a "high crime" region.  *Id*. at 1110.  In any case, the court held travel agents and tour operators, "had no legal duty to do a general survey of crime statistics in St. Thomas."  *Id.*  This holding is consistent with the New York law discussed above, which has uniformly held there is no duty to investigate or warn absent actual prior knowledge.  *See, e.g., Sacks v. Loew's Theatres, Inc*., 47 Misc. 2d 854, 856, 263 N.Y.S.2d 253 (Spec. Term. Queens Cnty. 1965) (noting that the theory that the travel agent, "concededly a middleman in the transaction, owed any duty or obligation to plaintiffs to forewarn them of such a far-fetched possibility that The Hotel would commit the tortious acts complained of, is as absurd as it is without merit.");  *Weiner*, 60 A.D.2d at 433, 401 N.Y.S.2d at 95-96.

In other similar cases involving criminal attacks on tourists that have occurred on the public streets of a travel destination, the courts have unanimously rejected all theories of liability against travel agents and tour operators.  In *Fling*, 765 F. Supp. 1302, two plaintiffs were attacked at night around 10:00 p.m. as they (husband and wife) and two other companions walked back from a casino just two blocks away from their hotel.  *Id.* at 1303.   Despite the plaintiffs' attempt to show that the area of the hotel was a high crime area, the court granted summary judgment.  The *Fling* court found, "no duty of investigation is imposed on the travel agent and unless the travel agent knew or should have known of the potential harm that occurred, no duty arises to warn the traveler of the particular hazard." *Id.* at 1305.  The court held that no evidence regarding the Grand Bahamas' alleged status as a "high crime" area could reasonably create a duty to investigate or to warn.  The defendants had sent over 5,000 people to the same hotel before the incident and 15,000 after without another report of a threat or attack on a traveler.  *Id.* at 1306.  The *Fling* court again reaffirmed that a travel agent and tour packager may reasonably rely on a hotel and travel destination's general reputation in making arrangements. The same result was obtained in *Taylor*, 56 Ohio App. 2d 117, 381 N.E.2d 944, in which an appellate court of Ohio rejected the plaintiff's attempt to recover from a purse-snatching incident that had occurred in the public streets of Rome.  Again, as here, there was no relevant duty of investigation or to warn of general criminal threats.

It cannot be materially disputed that Vantage had no direct employees on the tour or near the hotel, and no person connected to Vantage directed Plaintiffs' traversal across the stone bridge and through the pedestrian tunnel, rather than by walking along the street.  In fact, Ms. Giuffra indicated that her default preference would have been to utilize transportation between

the hotel and "Old Town" but in the circumstances she and her husband chose to walk with a younger couple who appeared young and strong and wanted to walk:

> My choice would have been to take the car, but in order of priorities, if it meant the car or being alone, I would rather go with them. I didn't want to be alone

(Weller Decl. Ex. 4, M. Giuffra Dep. at 23.)  Mr. Giuffra also acknowledged the availability of transportation both ways.  (Rule. 56.1 Stat. ¶ 41.)  The decision to walk on the night of the accident was the Plaintiffs' alone.

There was nothing Vantage could have done to restrain the criminal assailant, thwart the criminal attack, or foretell the time and place when Plaintiffs may encounter a pickpocket. Plaintiffs were in the best position to assess any relevant "safety factors" regarding the stone bridge and to weigh their options of transportation and traversing the bridge by walking. Indeed, Ms. Giuffra noted in her deposition that she and her husband observed the bridge and felt perfectly safe before they walked across through the tunnel:  "We were walking across the bridge -- it was really nice. This is not a place that looks seedy. It was a lovely, charming touristy kind of place." (Weller Decl. Ex. 4, M. Giuffra Dep. at 25.)

Moreover, the risk that materialized in this case – the risk of pickpocketing or robberies on tourists – is an obvious hazard, of which any tourist should be aware.  "When a person travels to a foreign city, state or country they take with them the chance of encountering unknown dangers." *Fling*, 765 F. Supp. at 1307.  The Giuffras were experienced travelers who should have been particularly cognizant of this possibility.  Prior to the trip with Vantage, they had traveled widely throughout Europe, including the Netherlands, Hungary, Greece, and Turkey. (Rule 56.1 Stat. ¶ 4.)  It can reasonably be inferred that they knew a risk of pickpocketing lurked in any of their trips abroad.

- 12 -

D.      Plaintiffs Cannot Show Negligence By Vantage Because Plaintiffs Received
        Adequate Warnings, the Tour Guide's Statement Was True, and Vantage
        Reasonably Investigated the Reputation of the Hotel

Even if any duty applied to warn or conduct some inquiry or investigation into the hotel

and its immediate vicinity, Plaintiffs cannot present evidence of negligence.  First, Plaintiffs in

fact did receive an adequate warning regarding the danger of robberies on tourists.  The

documents given the Giuffras when they paid for their trip specifically warned them about the

obvious risk or danger of robberies against tourists:

> Please keep in mind that in any tourist destination, you need to be aware
> of your surroundings… Although incidents of theft and pickpocketing
> while on tour are rare, it is important to be cautious and aware.

(Weller Decl. Ex. 7 at 30.)

Moreover, Mr. Giuffra acknowledged in his deposition that he was told by a tour guide

when they began their land portion of the trip through the Baltic States that they needed to be

more careful:

> Q.      So when you got off the boat in St. Petersburg and then you went
>         on to this extension where you would be going to Estonia and
>         Latvia, at that point, you raised the questions as to whether or not
>         those areas were safe with Irina?
> A.      Yes. Well, when we got off the boat, we stayed in a hotel in St.
>         Petersburg two or three days, and that was the end of the first
>         segment of the trip, and then we were going to go to the Baltic
>         Republics.
> Q.      Did she tell you that there was petty crime in some of these areas?
> A.      Well, I think she did mention that you had to be careful in these
>         areas – why, I don't know.  It's interesting that we were in
>         Moscow and we walked around and we didn't worry about it.  St.
>         Petersburg was a nice city.  In fact, our daughter met us there in St.
>         Petersburg.
> Q.      But ***Irina [sic] told you that you have to be careful in the areas
>         you were going to, right?***
> A.      ***Yes. She emphasized more that you had to be worried about the
>         Baltic Republics.***  I had never been there before.  I had an idea
>         where it was, but that was it.
>         . . .

Q.   How did the hotel [Radisson Blue Daugava] seem when you first got to it?

A.   The hotel was on the other side of the river from Riga and looking at it, it seemed okay.

Q.   When you say that the area that you did the tour on in Riga seemed okay, you felt safe there and comfortable?

A.   Yes, relatively safe.  We were all together, you have to realize.

Q.   You had the same feeling when you got to the hotel on the other side of the river?

A.   Yeah.  It's funny when I think about it in retrospect.  There was, as I said to you, two Mercedes -- it stuck in my mind -- they were on the bridge and we didn't take them.  It was a beautiful day, so we decided to walk across the bridge.

Q.   Your first impression was that the area that you did tour on in Riga in the city itself and then when you got to the hotel that those areas seemed safe to you; is that right?

A.   We didn't go to Riga, the city itself.  We were on the outskirts, if I recall.

…

Q.   But ***Irina [sic] told you that in these areas you had to be careful***, right?

A.   ***Yes, she did***.

Q.   Did she tell you that you had to be careful because people get pickpocketed from time to time?

A.   Specifically, not that you had to worry about pickpockets.  ***She said, you have to watch yourself.***

Q.   You have to watch yourself, why?

A.   ***That someone could be pickpocketing or beating you up or so forth***.

Q.   So, you had to be careful in a foreign country?

A.   Well, you know, it's funny. ***This particular area, she sort-of emphasized that you had to be worried about it.*** The other places in the cruise, from Moscow to St. Petersburg, we did big stops, and there were very small villages and there was no one there.

Q.   So, as you got to the Baltic countries and Latvia, she told you that you had to be more careful than where you were previously, right?

A.   Right.

. . .

Q.   But she told you previously, before you got to the Baltic Republics, that you needed to be more careful there than in other areas, right?

A.   Yes, she did.

(Weller Decl. Ex. 3, R. Giuffra Dep. 26:13–29:20, 33:13-16.) (emphasis added).  Mr. Giuffra

also testified:

> Q.     On any of the trips that you took prior to July of 2012, did any of the organizers of the trips or the people that were running trips warn you that areas might be potentially dangerous; that there might be criminal activity or pickpocketers?
>
> A.     I think the only time we got told was in Latvia was in that area, the Baltic Republics.  The other times, like the one to the Greek Islands, was a small group.  The other ones were big cruise ships, and no one really said anything.

(Weller Decl. Ex. 3, R. Giuffra Dep. 19:10-19.)  It defies logic to suggest that the Giuffras were somehow unaware that they might encounter a pickpocket.  But to the extent they might suggest this was the case any lack of knowledge of this danger was alleviated through Vantage's written and oral warnings. (Rule 56.1 Stat. ¶¶ 19, 39.)

Similarly, nothing that Plaintiffs have alleged regarding their reliance on the Riga tour guide identifies any negligence by her.  There is no indication that she had knowledge that her purported statement was false or that she had any notice or knowledge that a robbery or pickpocketing was more likely to occur at the particular time and location when Mr. Giuffra was robbed.  As noted by the *Manahan* court in remarkably similar circumstances, the tour guide's alleged statement may only be construed to mean that in her experience, the stone bridge was safe and she knew of no prior criminal incidents on it.  821 F. Supp. at 1109.  As in the *Manahan* case, Plaintiffs had their own opportunity to observe and assess the safety of the bridge and could best evaluate their own ability to resist or survive a potential robbery under the circumstances.  As the *Manahan* court noted, a party "may not blindly act on a statement in disregard of an opportunity to learn the truth when by the exercise of ordinary attention he would have learned it."  821 F. Supp. at 1112.

Vantage also reasonably relied on the general reputation and information available about the Radisson Blu Daugava hotel in Riga, Latvia in making arrangements for the tour.  There is no factual dispute that the Radisson Blu Daugava is a reputable and well-recognized hotel chain

- 15 -

in Europe and that it is a four-star hotel. (Rule 56.1 Stat. ¶¶ 24-25, 30; Guevara Decl. ¶¶ 23-24.)

It has favorable reviews through various travel review services such as Trip Advisor and others.

(*Id.*) Vantage also reasonably utilized the special local expertise of its regional buyers, who

screened accommodations for the Baltic States tour in which the Giuffras participated. (Rule

56.1 Stat. ¶¶ 21-25.) In fact, before Plaintiffs' stay at the Radisson Blu Daugava, Vantage had

booked approximately 324 tour participants at the same hotel who reported no incident. Since

Plaintiffs' stay at the hotel, Vantage has booked an additional 376 tour participants at the same

hotel who have also reported no incident. (Guevara Decl. ¶¶ 25-29.) Vantage's acts cannot

reasonably be construed as culpable negligence. Indeed, a tour operator or travel agent "does not

owe a duty to warn tourists as to general safety precautions" or "to inquire about crime at [the

lodgings] or the tour destination in general." *Manahan*, 821 F. Supp. at 1114.

> E.   In Any Case, Plaintiffs Cannot Establish Negligent Acts or Omissions by Vantage Because Plaintiffs Cannot Demonstrate Any Grounds for Attributing the Riga Tour Guide's Acts to Vantage

Even if Plaintiffs could make out a *prima facie* case of negligence only as to certain

statements allegedly made by the tour guide on the ground in Riga, Latvia, Irene Nikolashina

(which they cannot do given the impossibility of precisely foretelling a pickpocketing), that

would not advance their position because they cannot overcome the fact that Vantage is at least

two (2) legal relationships removed from Ms. Nikolashina. Ms. Nikolashina was an independent

contractor that was hired as a "ground operator" by yet another entity, a "third-party supplier" for

Eastern Europe, Guides and Tourist Services ("GTS") of Moscow, Russia. (Rule 56.1 Stat. ¶¶

26-29.) GTS was itself an independent contractor of Vantage tours. (*Id.*) Because the tour guide

was an independent contractor of yet another entity, any negligence on her part may not imputed

to Vantage under New York law. *Dorkin,* 43 A.D.2d at 877 (holding that independent contractor

relationship between European tour bus operator and New York travel agent "precludes liability

- 16 -

on either a theory of negligence or breach of contract."); *Smith v. West Rochelle Travel Agency, Inc.*, No. 8412/94, 1996 N.Y. Misc. LEXIS 592 (Sup. Ct. Westchester Cnty. April 10, 1996), *aff'd*, 238 A.D.2d 398, 399 (2d Dep't 1997).

Vantage anticipates that Plaintiffs will attempt to overcome the legal and factual separation of Vantage from the tour guide by suggesting an "apparent agency" existed between Vantage and the tour guide through representations in travel brochures and T-shirts the independent tour guides wear for the benefit of Vantage tour participants.  However, courts have rejected such theories in the context of unrelated companies or persons who operate abroad and are not subject to the control of the defendant.  In *Dorkin*, for example, the court held that an on-site tour operator such as GTS was not an agent for a travel agent or tour packager in the United States, such as Vantage; rather the on-site tour operator and tour guides acted as their own principals whose services the travel agent or tour operator only advertised and contracted in a convenient package for the benefit of travel participants.  It was material that "defendant did not itself own or control airlines, foreign hotels or modes of transportation, but, rather, acted as domestic agent for those foreign or domestic corporations." 74 Misc. 2d at 674.  It then followed that "liability must fail on the ground that an agent is not responsible for the tortious conduct of the principal."  *Id*.  Similarly, the court in *Smith* refused to impute any liability from an independent contractor that the defendant had hired directly as a ground handler to provide transportation and promote a related "booze cruise."  The defendants, as here, also did not own or operate and had no direct relationship with the vessel and its operators on which the plaintiff died.  238 A.D.2d at 399-400; *see also Meshel v. Resorts International of New York, Inc.*, 160 A.D.2d 211 (1st Dep't 1990) (even between affiliated companies using similar names in

marketing materials, defendant's lack of control over related entity and absence of other connection to the facts precluded vicarious liability).

Moreover, Vantage's Terms and Conditions preclude any inference that Plaintiffs were misled by any representations, since they made clear that the tour guides were factually and legally separate persons and entities. (Rule 56.1 Stat. ¶¶ 13-17.)  New York courts have refused to find any apparent agency where a travel agent or tour packager has specifically disclaimed responsibility and liability for the actions of its independent contractors.

In sum, Vantage was at least two degrees removed from the independent suppliers of tour services in the Baltic area and the tour guide which that entity had hired.  (Rule 56.1 Stat. ¶¶ 26-29.)  The use of the "Vantage" name in itself made no representations regarding authority of control, but rather branded and identified the tour packages these independent providers supply and sell through Vantage.  Vantage's Terms and Conditions made it clear to Plaintiffs that Vantage's role in packaging and booking the tours for Plaintiffs' convenience was remote and it had no control or supervision of the independent suppliers of travel services.  (Rule 56.1 Stat. ¶¶ 13-17.)  Indeed, under settled New York precedents, Plaintiffs cannot rely on any theory of vicarious liability or apparent agency.

> F.     Vantage Is Entitled to Summary Judgment Because Plaintiffs' Admissions Show the Immediate Vicinity of the Hotel Was Safe and Thus Plaintiffs Cannot Show Any Actual or Constructive Notice of a Dangerous Condition

Putting aside that Vantage did not breach any duty it owed to Plaintiffs, they cannot establish that the area where Mr. Giuffra was attacked was not safe.  It is well-established in the law of negligence that a duty to warn or otherwise respond to an alleged dangerous condition requires at least actual or constructive knowledge of that condition.  *See, e.g., Buckeridge v. Broadie*, 5 A.D.3d 298, 774 N.Y.S.2d 132 (1st Dep't 2004) (a landlord has no duty to respond to alleged criminal safety danger in a building without actual or constructive notice of the specific

criminal threat that materialized); 85 N.Y. Jur. 2d Premises Liability § 45.[14]  Because the area in the immediate vicinity of the hotel in fact was and remains comparatively safe, there can be no inference that Vantage should have known, or that any independent contractor should have known, that a specific warning was required or which required Vantage to stop using the hotel.

Plaintiffs' expert, Richard Hudak, acknowledged in his deposition that random acts of street crime can occur anywhere.  In fact, Mr. Hudak – a purported expert in security – testified that he himself was pickpocketed in Prague, Hungary while on duty.  (Weller Decl. Ex. 19, Hudak Dep. 68:23–69:23.)  A random pickpocketing or mugging does not equate to a lack of general safety in an area.  Pickpockets are a threat in many popular tourist destinations, such as the Netherlands and Greece, other areas to which the Giuffras traveled prior to the trip on which the incident occurred.  People regularly travel to those destinations and they are not considered "unsafe" such that a travel agent risks incurring liability for booking hotel accommodations in those travel destinations.

Perhaps the best proof of the general safety of the area of the assault is the report prepared by the very investigator *Plaintiffs hired*.  Mr. Hudak, the Plaintiffs' security expert testified that he hired Corporate Global Solutions ("CGS") to perform a security incident risk assessment of the location where Mr. Giuffra was attacked.  CGS performed an exhaustive on the ground analysis of the area where Mr. Giuffra was robbed.  They interviewed personnel at the hotel, the police and personnel from the Riga Tourism offices.  They concluded that the area

---

[14] *See also Petition of Binstock*, 13 F. Supp. 909, 915 (S.D.N.Y. 1963) (under New York law there could be no affirmative duty to warn of alleged dangerous weather without actual or constructive notice of specific hazard; the evidence for constructive notice also supported inference that decedent should have known of the danger), *aff'd sub. non., Binstock v. Friedman*, 330 F. 2d 267 (2d Cir. 1964); *Beck v. J.J.A. Holding Corp.*, 12 A.D.3d 238, 240, 785 N.Y.S.2d 425 (1st Dep't 2004) (a landlord's duty to respond to a dangerous condition requires actual or constructive notice of the alleged dangerous condition, such as mold, and not just a related condition, such as water leaks).

- 19 -

where Mr. Giuffra was robbed is relatively safe.  Their report specifically noted the following

points:

- "since 04.12.2009 Riga Municipal Police has a special Tourism Division to ensure public order and to inform visitors of the city about the accepted rules of behavior in Riga…"  (Weller Decl. Ex. 20 at 2.)

- "representatives of the [Riga] Police stated that the area around the hotel 'Radisson Blu Daugava,' in comparison to other places in Riga city, is quite safe for tourists and city guests."  (*Id.*)

- according to the Riga Tourist Information centers, "[t]he area around the hotel 'Radisson Blu Daugava' and Stone Bridge was described as safe during conversations."  (*Id.* at 6.)

These data points confirm that there can be no issue of fact that the area around the hotel and

stone bridge where Plaintiffs were injured is not "unsafe" or any less safe than other parts of

Riga, Latvia.  So too, the U.S. State Department, in 2012, stated that Latvia is a relatively safe

country, though random acts of pickpocketing can occur.  The State Department issued similar

advisories in 2012 for other popular tourist destinations such as Germany, Greece, Turkey and

Jamaica.  (*See* Weller Decl. Ex. 22, Ex. 24, Ex. 25, Ex. 26.)  Similarly, publicly available crime

statistics conclusively demonstrate that Latvia's crime rate is similar to other European countries.

(*See* Weller Decl. Ex. 27, Ex. 28.)

Given this evidentiary record, there can be no issue of fact that neither Vantage nor any

independent contractor may be imputed with constructive knowledge regarding any increased

risk for Mr. Giuffra of encountering the risk of a pickpocket.  The fact that a pickpocket would

target Mr. Giuffra could not have been predicted.  It was not and could not have been predicted

through the reasonable exercise of due care by Vantage.  It is once again worth noting that, a tour

operator or travel agent "does not owe a duty to warn tourists as to general safety precautions" or

"to inquire about crime at [the lodgings] or the tour destination in general."  *Manahan*, 821 F.

Supp. at 1114.  Permitting liability to attach under these circumstances would divorce negligence

liability from its underlying rationale and make travel agents, tour packagers and operators the compelled insurers for their customers.  That course is unwise, unnecessary and unprecedented, and should be rejected here.

      G.      <u>Independently, Vantage Is Entitled To Summary Judgment Because Its Terms and Conditions Apply to Preclude Any Liability for Plaintiffs' Injuries</u>

      Plaintiffs were issued and received a contract which contained a comprehensive disclaimer of any possible liability for injuries that might be incurred while on their trip—including criminal activities, regardless of whether these were the result of the actions of any individual supplying services on the trip, including services provided by a tour guide.  (Rule 56.1 Stat. ¶¶ 13-17.)  While Mr. Giuffra, a member of the bar of this Court and of the bar of the State of New York, may not have read the terms he and his wife are nevertheless bound by them. *Starkey v. Gap Adventures, Inc.*, 2014 U.S. Dist. Lexis 42461 (S.D.N.Y. Mar. 27, 2014) (tour participant bound by terms and conditions regardless of whether they were actually read); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012) (same).

      In the seminal case of *Dorkin*, 43 A.D.2d 877, the New York Appellant Division, Third Department, held that a disclaimer of liability, virtually identical to that present here, negates any claim based on either negligence or breach of contract for injuries to a tour participant.  *Dorkin* has been relied upon by courts throughout New York, including the Second Department in *Avonov v. Bruins Transportation, Inc.*, 294 A.D.2d 522, 742 N.Y.2d 389 (2d Dep't 2001) and S*mith*, 238 A.D.2d at 399, 656 N.Y.S.2d at 344, and by the U.S. District Court for the Eastern District of New York in *Loeb*, 793 F. Supp. at 438.

      To put it another way, regardless of what the tour guide may or may not have told plaintiffs in touring Riga, Latvia, Vantage  is entitled to summary judgment.  The disclaimer received by plaintiff clearly and specifically disclaims liability for any personal injuries resulting

- 21 -

either from criminal activities, as occurred here, or as a result of the actions of anyone supplying services as part of the tour, which would include an independent tour guide.  (Rule 56.1 Stat. ¶¶ 13-17.)  The contract plaintiffs entered with Vantage precludes this suit.

## II.    PLAINTIFFS' CLAIM FOR BREACH OF WARRANTY MUST BE DISMISSED

Plaintiffs' claim premised on breach of warranty is barely colorable and entirely lacking in legal merit, given Vantage's written representations expressly *excluding* any voluntary warranty regarding Plaintiffs' tour.  *See, e.g, Raskin v. Ulysses Lines, Ltd*., No. 79 Civ. 4275 (HFW), 1980 U.S. Dist. LEXIS 9363 (S.D.N.Y. Sept. 10, 1980) (travel agent did not assume any specific responsibility or warranty regarding the safety of a vessel it neither owned or controlled since its contract express indicated that the vessel was independently owned and operated); *Dorkin*, 74 Misc. 2d at 675;  *Loeb*, 793 F. Supp. at 439; *see also Hassett v. Cape Cod Bicycle Tours, Inc.*, No. 87-0016-Z, 1987 U.S. Dist. LEXIS 8321, 1987 WL 17540, at *1 (D. Mass. Sept. 3, 1987).

The case law uniformly holds that a breach of warranty may only be voluntarily assumed, and no facts that Plaintiffs can identify show any express warranty that no harm would befall Plaintiffs during their tour through the Baltic States.  Such representations as indicating 27 years' experience booking "worry free vacations" in a case in which the plaintiff was raped in her hotel, *Catalano v. NWA, Inc.*, No. No. PI 98–7768, 1998 WL 777023 (D. Minn. 1998), that time-share brokers inspected destinations for quality and had "quality and safe resorts in their network," *Heidle*, 2003 WL 22383568, at *3, or that a trip would be "safe and reliable" in which the plaintiff slipped in a cavern, *LaVine v. Gen. Mills, Inc*., 519 F.Supp. 332, 336 (N.D. Ga. 1981), are not sufficiently definite to indicate the making of a contractual warranty.

Here, Plaintiffs cannot identify any written representations that guaranteed their safety from pickpockets or other criminal actions.  To the contrary, Vantage expressly (1) warned

Plaintiffs in written form of this danger, (2) explained in written form that Vantage had no ability to control the acts of its independent suppliers and it assumed no responsibility for their actions. (Rule 56.1 Stat. ¶¶ 13-17, 19.)  This Court must dismiss Plaintiffs' spurious claim.  Any contrary holding would open the door for the kind of insurer-like liability against all travel agents and tour packagers that New York has rejected.

## III.   PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY MUST BE DISMISSED

Defendant Vantage was not a fiduciary to Plaintiffs.  Vantage sold a pre-packed tour to Plaintiffs.  Plaintiffs' had minimal interactions with Vantage to the extent of purchasing and booking the Baltic States tour.  (Rule 56.1 Stat. ¶¶ 9-11.)  No specific needs of Plaintiffs were discussed with defendant or taken into account in selling the tour package at issue.  It cannot reasonably be inferred that Plaintiffs entered a special legal relationship of trust and confidence, nor was the relationship removed from the realm of contract.  *See WIT Holding Corp. v. Klein,* 724 N.Y.S. 2d 66, 68 (2d Dep't 2001) (arm's length business transaction does not give rise to a fiduciary relationship).  Plaintiffs can cite no case law to suggest that a mere tour packager, such as Vantage, has a guardianship-like fiduciary responsibility for the safety and wellness of travelers abroad.  *See Lumauig v. Philippine Airlines*, 624 F. Supp. 238 (S.D.N.Y. 1985) (under New York law travel agents do not have a fiduciary responsibility over travelers such as to permit recovery of emotional distress damages upon an alleged breach of contractual obligation); *Russell v. Celebrity Cruises*, 2000 U.S. Dist. Lexis 10332 (S.D.N.Y July 24, 2000) (no fiduciary relationship between customer purchasing cruise and Liberty, a ticket agent).  Plaintiffs never entered a special legal relationship of trust and confidence that required Vantage to assume responsibility over their safety and well-being.  *Compare EBC I v. Goldman Sachs*, 5 N.Y.3d 11, 19 (2005) ("If the parties . . . do not create their own relationship of higher trust, courts should

- 23 -

not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them"). For the reasons already noted, Vantage's disclaimer of liability also applies to this claim and precludes any finding of liability of any theory. Accordingly, this claim is also spurious and must be dismissed.

## IV.    PLAINTIFF MARY GIUFFRA'S CLAIM FOR LOSS OF SERVICES MUST BE DISMISSED

Plaintiff Mary Giuffra's claim for loss of services is derivative of her husband's claim for negligence. *Maidman v. Stagg*, 82 A.D.2d 299, 301, 441 N.Y.S.2d 711, 713 (2d Dep't 1981). With dismissal of his negligence and other claims, this claim must also be dismissed.

## CONCLUSION

For all the foregoing reasons, Defendant Vantage Tours respectfully requests that this Court grant summary judgment in defendant's favor, dismissing the Complaint in its entirety, with prejudice, and for such other and further relief the Court deems just and proper.

Dated: March 23, 2015
        Jericho, New York

                              NIXON PEABODY LLP


                              By:____/s/ James Weller_____
                                     James W. Weller
                              50 Jericho Quadrangle, Suite 300
                              Jericho, New York 11753-2728
                              516-832-7500
                              jweller@nixonpeabody.com

                              *Attorneys for Defendant*

- 24 -