UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT J. GIUFFRA and MARY GIUFFRA,<br><br>Plaintiffs,<br><br>-against-<br><br>VANTAGE TRAVEL SERVICE,INC. d/b/a VANTAGE DELUXE WORLD TRAVEL,<br><br>Defendant. | Case No.: 13-cv-6880 (KBF)<br><br>**PLAINTIFFS'<br>MEMORANDUM<br>OF LAW**<br><br>Docket No.: 49 |

<u>**TABLE OF CONTENTS**</u>

Page

A. <u>Area was Not Reasonably Safe Under the Specific Circumstances at Issue</u>...........6

   1. Defendant's Failure to Sustain Initial
      Burden as Movant for Summary Judgment..........................................6

   2. Evidence that Walking on the Subject Bridge was Not Reasonably Safe..........7

      a. State Department Warnings.......................................................7

      b. Admission of Irene Nikolashina of Impropriety of Walking..............7

      c. Evidence of Numerous Prior Criminal Incidents on the Bridge...........8

B. First Theory of Liability: Vantage Failed to (1) Research and (2) Relay Reasonably
   <u>Obtainable Information Regarding Propensity for Crime on the Subject Bridge</u>......10

   1. Distinguishing Manahan v. NWA....................................................11

   2. Distinguishing Cases that Say there is No Duty to
      Warn of Conditions Not on Defendant's Property..............................14

   3. Vantage's Fiduciary Duty............................................................15

   4. Vantage's Duty Heightened by Brochure Promises...............................20

   5. Instead of Warning of the Prevalence of
      Pickpocketing, Vantage did the Opposite.......................................21

   6. Failure to Sustain Initial Burden as Movant for Summary Judgment
      in Showing that Hazards on Bridge was Not Reasonably Obtainable..............22

1

C. Second Theory of Liability: Vantage Vicariously Liable for Irene Nikolashina <u>Affirmatively Advising Tourists that Walking on the Bridge was Very Safe</u>……...23

    1.  Affirmative Negligence of Irene Nikolashina…………………………………23

    2.  Vantage Estopped from Arguing Irene Nikolashina was Not its Employee…...24

D. There is No Waiver of Liability……………………………………………….…26

    1.  Failure to Plead Waiver/Release as an Affirmative Defense………………….26

    2.  Clause Ambiguous…………………………………………………………...27

    3.  Clause Does Not Cover Vantage's Own Negligence………………………….27

    4.  Matter of Dorkin Easily Distinguishable………………………………………28

**TABLE OF AUTHORITIES**

CASES:

Page

Adickes v. S. H. Kress & Co.,
398 U.S. 144, 90 S.Ct. 1598 (1970)....................................................... 6

Brooks Place Properties, LLC v. Dimaria,
30 Mass.L.Rptr. 147 (Mass. Super. 2012)............................................... 26

Brown v. Poritzky,
30 N.Y.2d 289, 332 N.Y.S.2d 872 (1972)............................................... 24

Chaparro v. Carnival Corp.,
693 F. 3d 1333 (11th Cir. 2012)........................................................... 19

Cohen v. Heritage Motor Tours, Inc.,
205 A.D.2d 105, 618 N.Y.S.2d 387 (2nd Dept. 1994)................................ 23-4

Cooke v. Allstate Management Corp.,
741 F.Supp. 1205 (D.S.C. 1990)......................................................... 28

Cowden v. BNSF Ry. Co.,
980 F.Supp.2d 1106 (E.D.Mo. 2013).................................................... 10

Creteau v. Liberty Travel, Inc.,
195 A.D.2d 1012, 600 N.Y.S.2d 576 (4th Dept. 1993)............................... 9, 17

Dorkin v American Express Co.,
43 A.D.2d 877, 351 N.Y.S.2d 190 (3rd Dept. 1974).................................. 28-9

Douglas v. Steele,
816 P.2d 586 (Okl.App. 1991)............................................................ 16

In re DeVries,
Slip Copy, 2014 WL 4294540 (Bkrtcy. N.D.Tex. 2014)............................... 9

Jacobson v Princess Hotels Intl.,
101 A.D.2d 757, 475 N.Y.S.2d 846 (1st Dept. 1984).................................. 25

Josephs v. Fuller,
186 N.J. Super. 47, 451 A.2d 203 (1982)............................................... 16, 18

Kansallis Finance Ltd. v. Fern,
421 Mass. 659 (1996)...................................................................... 26

Lachina v. Pacific Best Tour, Inc.
1996 WL 51193 (S.D.N.Y. 1996)......................................................... 19

Levin v. Kasmir World Travel, Inc.,
143 Misc.2d 245, 540 N.Y.S.2d 639 (N.Y. City Civ. Ct. 1989)..................... 16

Loretti v. Holiday Inns, Inc.,
1986 WL 5339 (E.D. Penn. 1986)......................................................... 17-8

Manahan v. NWA,
821 F. Supp. 1105 (D.V.I. 1991).......................................................... 11-14

Maraia v. Church of Our Lady of Mount Carmel,
36 A.D.3d 766, 828 N.Y.S.2d 525 (2nd Dept. 2007).............................14, 23

Miles v. R & M Appliance Sales, Inc.,
26 N.Y.2d 451, 259 N.E.2d 913, 311 N.Y.S.2d 491 (1970)........................ 24

Miller v. Group Voyagers, Inc.,
912 F.Supp. 164 (E.D.Pa. 1996)........................................................... 27

Passero v. DHC Hotels and Resorts, Inc.,
981 F.Supp. 742 (D. Conn. 1996)...................................................... 15, 17

Pekelis v. Transcontinental & Western Air, Inc.,
187 F.2d 122 (2nd Cir. 1951)............................................................... 9

Pellegrini v. Landmark Travel Group,
165 Misc.2d 589, 628 N.Y.S.2d 1003 (N.Y. City Ct. 1995)........................ 16

Quirk v. Walker's Gymnastics & Dance,
16 Mass.L.Rptr. 503 (Mass.Super. 2003)............................................... 27

Rookard v. Mexicoach,
680 F.2d 1257 (9th Cir. 1982).............................................................. 17

Rovinsky v Hispanidad Holidays,
180 A.D.2d 673, 580 N.Y.S.2d 49 (2nd Dept. 1992)...............................24-5

Sachs v. TWA Getaway Vacations, Inc.,
125 F.Supp.2d 1368 (S.D. Florida 2000)............................................ 15, 17

Schering Corp. v. Pfizer Inc.,
189 F.3d 218 (2nd Cir. 1999)............................................................... 9-10

Stevenson v. Four Winds Travel, Inc.,
462 F.2d 899 (5th Cir. 1972)……………………………………………………….. 20-21

Stone v. Pacific Delight Tours,
New York Law Journal, Dec. 27, 1978, p. 1, col. 4 (N.Y. Sup. 1978)…………………………. 26

Tuohey v. Trans Natl. Travel Inc.,
47 Pa. D. & C. 3d 250 (1987)……………………………………………………… 16, 18

U.S. v. Barletta,
652 F.2d 218, 220 (1st Cir.1981)……………………………….…………………… 10

U.S. v. Hampton,
843 F.Supp.2d 571 (E.D. Pa. 2012)……………………………………………………. 9

U.S. v. Miller,
478 F.3d 48 (1st Cir. 2007)…………………………………………………….. 8, 27

U.S. v. Thomas,
2015 WL 237337 (D.Conn. 2015)………………………………………………….. 10


STATUTES/RULES:

Federal Rules of Civil Procedure § 8………………………………………………..... 26

Federal Rules of Civil Procedure § 56 (2) ……………………………………………… 6

Federal Rules of Evidence § 801(d)(2)(B) ……………………………………………… 8, 9

Federal Rules of Evidence § 804 (3)(A) ……………………………………………….. 10

Restatement (Second) of Agency § 381……………………………………………… 15

<u>Legal Arguments</u>

A. <u>Area was Not Reasonably Safe Under The Specific Circumstances At Issue</u>

1. **Defendant's Failure to Sustain Initial
   <u>Burden as Movant for Summary Judgment</u>**

Defendant's motion assumes that the enclosed staircase of the Akmens Tilts bridge was safe. Defendant partially bases this on hearsay interviews with Riga police regarding the criminal situation in 2014, two years after the occurrence. These discussions are not only complete hearsay, but they are also without probative value, as they do not address the criminal situation on the bridge at the time of occurrence, or even close to that time. Moreover, the statistics only regard crimes against tourists, and not in general. This entire report is hearsay, and is not relied on by Plaintiff herein. <u>FRCP § 56 (2)</u> ("Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").

None of Defendant's witnesses know what the criminal situation was on the bridge at the time of occurrence. Not a scintilla of actual evidence has been submitted in Defendant's motion to show that the bridge was safe, that the tour guides with Plaintiffs had any information supporting their assertion that the bridge was safe, or that any investigation was done, whatsoever, to determine if the bridge and surrounding area was safe for unescorted elderly tourists to walk. As will be explained, this was in direct violation of Defendant's duty to do so.

Therefore, Defendants have not met their initial burden as movant for summary judgment in showing that the subject area was safe for tourists. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 90 S.Ct. 1598 (1970) ("the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required").

### 2. Evidence that Walking on the Subject Bridge and Surrounding Area was Not Reasonably Safe

#### a. State Department Warnings

As Defendant has failed to meet his initial burden, it is unnecessary for Plaintiff to submit any proof in opposition. Nevertheless, Plaintiff will be able to show that the area was not safe for tourists. Richard Hudak, Plaintiff's security expert, explains that warnings from the U.S. State Department regarding Riga and its Old Town, demonstrated that there was a high incidence of crime in areas of Riga such as the bridge (Exhibit 3). Crime on the bridge was especially foreseeable for elderly tourists like Mr. Giuffra, who was walking with only one other person at the time of occurrence, as in order to walk back from dinner in Old Town Riga, Mr. Giuffra walked in an enclosed staircase that provided a perfect cover for criminals.

Defendant would appear to argue that since State Department warnings regarding pickpockets are made regarding parts of other countries in Europe as well, that these warnings are meaningless. It is unclear why this should possibly be so. Old Town Riga Latvia has its problems, and some Europeans countries have their problems. Just as elderly tourists would be well advised not to walk on the enclosed stairways of the Akmens Tilts stone bridge, so would they be ill advised to walk in various parts of other countries: the two are not mutually exclusive (Exhibit 3).

#### b. Admission of Irene Nikolashina of Impropriety of Walking

The Vantage Program Manager, Irene Nikolashina, also admitted post incident that the area was unsafe. Although she told Plaintiffs prior to the occurrence that it was "very safe" to walk on the bridge, when speaking to Alicia Guevara of Vantage, she said that she told the Giuffras not to walk on the bridge (Statement of Facts). When the evidence is read in the light most favorable to the Plaintiff, affording Plaintiff all reasonable inferences, it is evident that Ms.

Nikolashina realized the folly of her suggesting that Plaintiff walk on this unsafe bridge, and told her employer she would (or should) never have said such a thing.

### c.   **Evidence of Numerous Prior Criminal Incidents on the Bridge**

Most importantly, internal Vantage emails demonstrate just how dangerous the bridge was. After the occurrence, Irene Nikolashina, the Vantage Program Manager, spoke to the police, who told her "per the police there that there are 10-15 muggings in that specific location per month in that area". This statement is not hearsay. Internal Vantage emails show that this police statement was believed to be true by Bethlehem Abebe, Vantages's Customer Care Correspondent.

On August 13, 2012, Ms. Abebe wrote an initial email regarding this issue. Soon after, Juan Gali, Vantage's Senior Director of Worldwide Quality, responded "[t]he Buyer is made aware of the issue". Sensing that the issue was not being taken seriously enough, Ms. Abebe demanded that based on the police's observation relayed to Ms. Nikolashina, "statistically, it seems like it is bound to happen again. We will not be receiving further feedback from a passenger unless there will be another mugging so I definitely think that at least making an effort in arranging logistics to transport passengers to and from the hotel if not changing the hotel is a wise idea". Clearly, Ms. Abebe believed the police statistics to be true, and manifested this belief by 'sounding the alarm' and calling for something to be done.

Ms. Abebe's emails regarding the police statement are not hearsay, and are therefore admissible. Federal Rules of Evidence § 801 states that the following is not hearsay:

> (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>
> (B) is one party manifested that it adopted or believed to be true;[1]

---

[1] U.S. v. Miller, 478 F.3d 48 (1st Cir. 2007) ("[t]he law of evidence long has recognized "adoptive

Here, Ms. Abebe's statement is offered against Vantage, and Ms. Abebe manifested her belief in

the police's statement by using it to argue that since it is apparently bound to happen again,

something needs to be done.

Under these circumstances, the statement the party believed to be true is not hearsay. In

re DeVries, Slip Copy, 2014 WL 4294540 (Bkrtcy. N.D.Tex. 2014) explains:

> Federal Rule of Evidence 801(2)(d)(B) does not require a showing
> of actual intent, but only that a party "manifested" that it adopted
> or believed a statement to be true. Indeed, the Advisory Committee
> Notes to Rule 801(2)(d)(B) state that "[u]nder established
> principles an admission may be made by adopting or acquiescing
> in the statement of another." "Adoption or acquiescence may be
> manifested in any appropriate manner. ... Federal Rule of Evidence
> 801(2)(d)(B) does not require that a party "demonstrate clearly the
> party's belief in *and* intentional adoption of" [FN34] certain
> information as Defendant suggests, but only that a party adopt or
> acquiesce in the statement of another. Furthermore, the Fifth
> Circuit has held that implied admissions are sufficient to support a
> finding that a party has manifested an adoption or belief in a
> report's truth. ... Footnote 34: It should also be noted that Federal
> Rule of Evidence 801(2)(d)(B) does not require that a party
> demonstrate a belief in *and* intentional adoption of a statement, but
> is satisfied upon a showing that a party either (1) manifested an
> adoption of a statement *or* (2) manifested a belief in a statement.

Here, a Vantage employee manifested her belief in the veracity of the police's statement

by utilizing it to suggest that concrete action be taken. Schering Corp. v. Pfizer Inc., 189 F.3d

218 (2nd Cir. 1999) ("a party admission containing hearsay is admissible where, as in Pekelis, the

admission draws inferences from the underlying hearsay and thus "manifest[s] an adoption or

belief in its truth." Fed.R.Evid. 801(d)(2)(B); Pekelis v. Transcontinental & Western Air, Inc.,

187 F.2d 122 (2nd Cir. 1951) ("the reports did not merely repeat what was told the board by

witnesses, but drew inferences as to what had in fact happened and those inferences were

---

admissions."; U.S. v. Hampton, 843 F.Supp.2d 571 (E.D. Pa. 2012) ("[p]rior to the adoption of the Federal
Rules of Evidence, the "adoptive admission" was more commonly referred to as a "tacit admission.").

contrary to the position taken by the defendant during the trial.").Cowden v. BNSF Ry. Co.,

980 F.Supp.2d 1106 (E.D.Mo. 2013) ("[t]o admit the Report under this hearsay exception, the

Court must determine, by a preponderance of the evidence, that a reasonable jury could properly

find Defendant adopted the Report as an admission. U.S. v. Barletta, 652 F.2d 218, 220 (1st

Cir.1981). While "a party admission containing hearsay is admissible where ... the admission

draws inferences from the underlying hearsay," a statement is generally inadmissible "when it

merely repeats hearsay and thus fails to concede its underlying trustworthiness." Schering Corp.

v. Pfizer Inc., 189 F.3d 218, 239 (2d Cir.1999)"; U.S. v. Thomas, 2015 WL 237337 (D.Conn.

2015) ("one treatise notes that "[i]f a party accepts or builds on the assertions of another, it is

usually fair to say she adopted them." Christopher B. Mueller & Laird C. Kirkpatrick,

4 FEDERAL EVIDENCE§ 8:47 (4th ed.2014)."

The statement by Ms. Abebe is also admissible under Federal Rules of Evidence Rule

804, which states:

> (3) Statement Against Interest. A statement that:
>
> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability

The statement was against the interest of Vantage, as it demonstrated a substantial problem with

the bridge that Vantage overlooked, and at the very least did not protect well enough against.

## B. First Theory of Liability: Vantage Failed to (1) Research & (2) Relay Reasonably Obtainable Information Regarding Propensity for Crime on the Subject Bridge

As will be discussed in detail below, Vantage, as the tour operator/packager, had a duty

to disclose to Plaintiffs "reasonably obtainable material information", such as the hazard posed

by criminal conduct on the bridge.

## 1. **Distinguishing Manahan v. NWA**

From reading Defendant's papers, without looking at the facts and discussion in the cited

cases, one may feel that the case of Manahan v. NWA, 821 F. Supp. 1105 (D.V.I. 1991) is

directly on point, thus precluding any possibility that any of the cases Plaintiff could possibly

cite are less relevant and thus not probative. Therefore, this case will be addressed at the outset,

as the facts in Manahan completely distinguish it from this matter.

Manahan states as follows (emphasis added):

> It is undisputed that MLT provided a briefing for its clients at
> which time **it warned its clients to take cabs at night because of
> crime in St. Thomas**. This warning statement, of course, was not a
> commandment that travelers were forced to follow. Instead, it was
> a strong suggestion from the tour organizer that cabs should be
> utilized in order to maximize safety.
>
> Even **after receiving this warning, plaintiff solicited
> Whitehouse's advice about the advisability of walking to local
> area restaurants. Necessarily, she wished to weigh the danger
> of walking to and from a local restaurant at night against the
> cost or inconvenience of taking a taxi**. Ultimately, plaintiff chose
> to walk to the Delly Deck Restaurant. She chose not to take a cab.
> That was her prerogative. **She had already been advised in the
> official briefing that only she, the visitor, could maximize her
> safety, and that she could do this only by taking a cab.**

In Manahan, Plaintiff was *specifically told that there was a high rate of crime in the specific area*

*she was in*, and that taking a cab would provide more safety than walking. Yet, Plaintiff did not

want to be bothered with taking a cab, and asked a guide if perhaps walking would still be okay.

Plaintiff was placed on notice that the area was unsafe and that it would be safer to take a cab

because this information was communicated to her by her guide. Despite having this information

she, made the decision to walk to her destination and disregard the warning given to her by the Defendant's representative.

The guide's act of telling her that it would be safe to walk was made against this evidentiary backdrop, and was meant only as part of "weigh[ing] the danger of walking to and from a local restaurant at night against the cost or inconvenience of taking a taxi". <u>Manahan</u>.

Here, by contrast, Plaintiffs were never told that there was any danger afforded by walking in the area surrounding the bridge to Old Town. Nor was any information communicated that taking a car service to Old Town and thus obviating the need to walk in the bridge would be a safer alternative. Plaintiffs were told to go to Old Town for dinner (Exhibit 8, p. 18, 22) (which necessitated going over the bridge). They were expressly told that the area was "very safe" for walking (Exhibit 8, p. 19). Most importantly, they were *encouraged* to walk by Ms. Nikolashina.

While they were generally told that one had to take care in the Baltic countries, they were never once advised not to walk instead of taking cabs. Most importantly, no information whatsoever was provided regarding safety to them. Furthermore, the cars would not have even helped, since they did not take people back as was acknowledged by Ms. Nikolashina in her report to Vantage (See Statement of Facts).

<u>Manahan</u> also states that "defendants had no legal duty to do a **general** survey of crime statistics in **St. Thomas**" (emphasis added). In that case, a tourist wanted to go someplace on the island on his own initiative. The tour could not have known each and every place someone may have wanted to go in advance. Here, by contrast, Vantage (who had prepared itineraries and schedules well in advance) knew they would be encouraging their tourists to go across this bridge to get to Old Town, and to do so by walking. They should have done basic investigation

12

into that **specific** area within Riga connecting the hotel to the Old Town which is the major tourist destination, especially as it contained a fully enclosed staircase. It was therefore eminently reasonable to require that some due diligence be done into inquiring of the safety of this limited area.

Defendant's reliance on <u>Manahan</u> is disingenuous to say the least. The Defendants in <u>Manahan</u> assessed the security in the area where they were placing tourists, expressly advised them of the safety and security issues and made recommendations to ameliorate the safety concerns.

In the instant matter, Vantage never assessed the security in the area where they were placing elderly tourists, minimized any safety concerns and in fact through its agents recommended an unsupervised excursion to Old Town which placed the tourists at an enhanced risk of foreseeable harm from pickpockets.

For <u>Manahan</u> to apply to the instant matter Vantage would have to have:

1. Assessed the security in the area surrounding the hotel and bridge leading to Old Town. However, it is undisputed that Vantage did not even review any information regarding safety or discuss the safety of the area with the local hotels or police or even look at consular affairs information. Had they done so, they would have learned that the main risk confronting tourists in the Old Town and surrounding area are pickpocketing, particularly in summer.

2. Assuming they acted as a reasonable tour company and learned of the significant risk of pickpocketing in this area, they would have to have communicated this fact to their guests. Clearly this was not done and in fact the risk was explicitly minimized in the

materials provided to travelers which indicated that "incidents of pickpocketing are rare" (Exhibit 6, p. 30).

3. Assuming that they communicated the risk of pickpockets to the Plaintiffs, Vantage would then have had to recommend a safe travel alternative which would have minimized the risk of harm from this source. This was not done.

4. Finally, Plaintiffs would have to have made a considered decision to not heed this advice and take their chances.

It is clear that none of those elements are present in this case as Vantage failed in its preliminary duty to act as a reasonable travel company and actually inquire about the safety situation in the area surrounding the location where they were placing a group of elderly tourists.

As Manahan regards a completely different factual scenario than the case at bar, it does not mandate anything different than the cases that follow demonstrate: that Vantage had a fiduciary responsibility to Plaintiffs, and had a duty to relay reasonably obtainable information, which included the safety hazard posed by this bridge's enclosed areas and the risk of pickpocketing in the surrounding area.

**2. Distinguishing Cases that Say there is No Duty to Warn of Conditions Not on Defendant's Property**

In cases such as Maraia v. Church of Our Lady of Mount Carmel, 36 A.D.3d 766, 828 N.Y.S.2d 525 (2nd Dept. 2007), Courts note generally that "[a] tour operator has no duty to warn group members of a possible hazardous condition on property it neither owns nor occupies". However, Maraia is not intended to absolve tour operators of any duty to warn, as evidenced by the numerous cases cited below that support such a duty. In Maraia, The Court specifically noted that the "platform from which the plaintiff fell was open and obvious and not inherently dangerous". The conditions in such other similar cases must have been readily observable even

to the tourists themselves, and the tour operator had no duty to warn of said conditions. Passero v. DHC Hotels and Resorts, Inc., 981 F.Supp. 742 (D. Conn. 1996); Sachs v. TWA Getaway Vacations, Inc., 125 F.Supp.2d 1368 (S.D. Florida 2000) (duty to warn "simply does not apply to an obvious dangerous condition equally observable by plaintiff, such as the presence of a floatation mat by a swimming pool in broad daylight").

Alternatively, in other cases noting this lack of a duty, the hazardous conditions on the premises were not considered "reasonably obtainable material information", but would only be known to the operator if it had intimate knowledge of the premises, beyond what could be expected of a tour operator. As discussed in detail below and in Plaintiff's Statement of Facts, this was not the case here.

### 3. Vantage's Fiduciary Duty

Vantage was Plaintiff's agent to make all arrangements regarding their trip. Vantage set the itinerary, arranged everything, and had a Vantage Program Manager with them at all times, giving instructions every step of the way. Vantage was Plaintiff's agent for purposes of making this trip. Restatement (Second) of Agency § 381 is therefore applicable. It requires[2] (emphasis added):

> Unless otherwise agreed, an agent is subject to a **duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him** and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

---

[2] This section has been cited by New York and Massachusetts Courts. Turner v. Guy, 2 Mass.App.Ct. 343, 311 N.E.2d 921 (Mass. App. Ct. 1974); Hadden v. Consolidated Edison Co. of New York, Inc., 45 N.Y.2d 466, 382 N.E.2d 1136 (1978); Cristallina S.A. v. Christie, Manson & Woods Intern., Inc., 117 A.D.2d 284, 502 N.Y.S.2d 165 (1st Dept. 1986); Landau v. Percacciolo, 66 A.D.2d 80, 412 N.Y.S.2d 378 (1978); Calspan Corporation v. Piech, 91 A.D.2d 844, 458 N.Y.S.2d 211 (4th Dept. 1982). See: Gagnon v. Coombs, 39 Mass. App. Ct. 144, 654 N.E.2d 54 (Mass. App. Ct. 1995) ("[a]n agent's duty to make full disclosure to the principal of all material facts relevant to the agency is a necessary corollary to the fundamental agency obligations of undivided loyalty and utmost good faith").

This duty has been noted to apply in the specific context of travel arrangements. Pellegrini v. Landmark Travel Group, 165 Misc.2d 589, 628 N.Y.S.2d 1003 (N.Y. City Ct. 1995) ("[p]rofessionalism and consumer reliance have created a special relationship between consumer and travel agent. Today's travel agent is the consumer's agent and a fiduciary with duties commensurate therewith"); Levin v. Kasmir World Travel, Inc., 143 Misc.2d 245, 540 N.Y.S.2d 639 (N.Y. City Civ. Ct. 1989) ("[i]t has been generally noted that beyond the duty to confirm travel reservations, travel agents should be expected to provide information which is necessary and of importance to the traveler").[3]

Vantage held their program managers out to be experts (Exhibit 6, p. 2). The duty of travel agents is heightened by agents' holding themselves out to be experts in the field that travelers may rely upon. Josephs v. Fuller, 186 N.J. Super. 47, 451 A.2d 203 (1982) ("[a] travel agent holds himself out as having some expertise, and a traveler should be able to rely on that expertise"); Tuohey v. Trans Natl. Travel Inc., 47 Pa. D. & C. 3d 250 (1987) ("[d]efendants concede that travel agents fall into the category of persons viewed by the courts as professionals who are required to exercise special care or expertise. They have considerably more expertise in making travel arrangements than ordinary lay persons ... The court held that a travel agent owes at least the duty to use reasonable skill and effort to ascertain and inform the customer of facts that are both relevant and crucial to him"). Vantage certainly had these same responsibilities and duties.

---

[3] See also: Douglas v. Steele, 816 P.2d 586 (Okl.App. 1991) ("[a]n agent who handles travel and vacation plans is a special agent of the traveler for the purposes of that one transaction between the parties. *McCollum v. Friendly Hills Travel Center,* 172 Cal.App.3d 83, 217 Cal.Rptr. 919 (1985) ... In *Josephs v. Fuller (Club Dominicus),* 186 N.J.Super. 47, 451 A.2d 203, 205 (1982), the court observed with a good deal of common sense that "it would be absurd to hold that [the travel agency] had no duty to acquire any knowledge of the facilities it was booking. Plaintiffs could well have made their own arrangements, choosing a resort at random. But rather than risk a substandard vacation, they took advantage of the service offered by defendant."

Included in Vantage's duty to provide information was a duty to disclose dangers of which they "should be aware in the exercise of due care". Rookard v. Mexicoach, 680 F.2d 1257 (9th Cir. 1982) ("it does not follow that because a travel agent cannot possibly presage all dangers, he should be excused entirely from his fiduciary duties toward his principal to warn of those dangers of which he is aware, or should be aware in the exercise of due care"); Passero v. DHC Hotels and Resorts, Inc., 981 F.Supp. 742 (D. Conn. 1996) ("a tour operator may be obligated, under some circumstances, to warn a traveler of a dangerous condition unknown to the traveler but known to it"); Creteau v. Liberty Travel, Inc., 195 A.D.2d 1012, 600 N.Y.S.2d 576 (4th Dept. 1993) ("where the agent has knowledge of safety factors or where such information is readily available, a travel agent has the duty to inform the customer of those factors").

Stated otherwise, Vantage should impart "reasonably obtainable material information". Sachs v. TWA Getaway Vacations, Inc., 125 F.Supp.2d 1368 (S.D. Florida 2000) ("courts have found that travel agents and tour operators, as agents of their customers, also have a duty to disclose reasonably obtainable information that is relevant to the object of the agency. Similarly, the Court in Loretti v. Holiday Inns, Inc., 1986 WL 5339 (E.D. Penn. 1986) states:

> A travel agent is more than a mere ticket agent. It is one which, in the interest of promoting the travel plans of a client, deals with carriers, plans an itinerary, arranges for hotel accommodations, guides and tours of each city and sets up the traveler's schedule. A travel agent cannot reasonably be expected to guarantee that a traveler will have a good time or will return home without having experienced an adverse adventure or harm. Nor can it reasonably be expected to divine or forewarn a traveler of the innumerable litany of tragedies and dangers inherent in foreign travel. This does not mean, however, that a travel agent owes no duty to its client. Rather, a travel agent has a duty to disclose reasonably obtainable material information to its client unless that information is so obvious to the client that, as a matter of law, the travel agent would not be negligent for failing to disclose it.

17

Based on this principle, the Court in <u>Loretti</u> found it necessary to relay reasonably obtainable

information about the safety of the area where:

> An examination of the Holiday Inn's records showed that there had
> been twenty incidents of crime within three months of the
> plaintiff's visit and that two of the crimes involved knife point
> robberies on the beach of the Holiday Inn's guests.

> The Court believes that there are at least two issues of material
> fact. The first issue is whether or not the beach near the Holiday
> Inn was safe. If a jury were to conclude that the beach was safe,
> then defendant Air Land would have satisfied its duty to the
> plaintiff by accurately reporting that there was no safety problem
> on the trip. If a jury were to conclude that the beach was unsafe,
> then it would have to reach the second issue of whether
> information that the beach was unsafe was reasonably obtainable
> by defendant Air Land. The Court notes that even if the plaintiff is
> successful in showing that the defendant breached its duty to
> disclose reasonably obtainable information, she must also show
> that there is a casual relation between the breach of the duty and
> her injuries in order to prevail on her negligence claim.

Here, it was eminently foreseeable that tourists on the tour would want to know about the safety

of the area on the bridge that was the direct link connecting the hotel to the tourist attractions.

Indeed, this was directly discussed prior to Plaintiff's going on the bridge. Instead of being told

anything about the bridge's problematic areas, let alone its history, Plaintiff was actually told it

was "very safe", and was encouraged to walk, without any qualifications.

 As the cases cited above found, not only is there a duty to warn of information that is

material to a tourist, there is a similar duty to find out reasonably obtainable information in the

first place. <u>Josephs v. Fuller</u>, 186 N.J. Super. 47, 451 A.2d 203 (1982) ("It would seem that a

travel agent who makes arrangements for a vacation not knowing anything about the

accommodations, has acted negligently"); <u>Tuohey v. Trans Natl. Travel Inc.</u>, 47 Pa. D. & C. 3d

250 (1987) ("Defendants' negligence was their complete failure to investigate the

accommodations at the Tradewinds Hotel prior to booking plaintiff's trip. ... The court held that a travel agent owes at least the duty to use reasonable skill and effort to ascertain and inform the customer of facts that are both relevant and crucial to him").

Based on these principles, the Eleventh Circuit found Carnival Cruises potentially negligent where it failed to warn patrons of potential criminal conduct near a beach it encouraged passengers to visit. Chaparro v. Carnival Corp., 693 F. 3d 1333 (11th Cir. 2012) held:

> [A] Carnival employee encouraged Appellants to visit Coki Beach in St. Thomas; Carnival was familiar with Coki Beach because it sold excursions to passengers to Coki Beach; Carnival generally knew of gang violence and public shootings in St. Thomas; Carnival knew of Coki Beach's reputation for drug sales, theft, and gang violence; Carnival knew or should have known of the gang member's shooting and funeral taking place near Coki Beach; Carnival failed to warn Appellants of any of these dangers; Carnival knew or should have known of these dangers because Carnival monitors crime in its ports of call; Carnival's negligence in encouraging its passengers to visit Coki Beach and in failing to warn disembarking passengers of general and specific incidents of crime in St. Thomas and Coki Beach caused Liz Marie's death; and Appellants have suffered various damages, including the loss of Liz Marie's life. This negligent failure-to-warn claim is more than a mere recitation of the elements of the cause of action.

The Southern District also passed on the duty to advise of potential criminal conduct in Lachina v. Pacific Best Tour, Inc., 1996 WL 51193 (S.D.N.Y. 1996), finding that when criminal conduct is foreseeable, it should be warned of, holding:

> In negligence action by two travelers who were robbed at gunpoint approximately 200 yards from their hotel, with one of travelers being shot and wounded during robbery, court would grant motion for summary judgment by defendants, who were tour packager and booking agent; travelers alleged that defendants breached duty to warn travelers of danger of criminal attack, in order to establish such duty on part of defendants, travelers had to show that defendants knew or should have known of forseeability of criminal attack; travelers failed to provide evidence of special circumstances to show that defendants knew or should have known of forseeability of criminal attack in vicinity of hotel. Fling v

Hollywood Travel & Tours (1990, ND Ohio) 765 F Supp 1302, affd (CA6 Ohio) 933 F2d 1008 (applying Ohio law).

As discussed in the Statement of Facts, in the present matter, the criminal conduct in the subject enclosed passageway was eminently foreseeable. This was something that even a cursory review of U.S. State Department warnings in effect at the time would show, as would a simple police query. Yet, Defendant did nothing, and instead suggested Plaintiffs walk on this "very safe" bridge. Even the very nature of the area as enclosed necessitated inquiry (Exhibit 3).

### 4.  **Vantage's Duty Heightened by Brochure Promises**

Based on the above cases, Vantage certainly had a duty to warn of the propensity for criminal conduct on the subject bridge, and especially in its enclosed passageways. It may additionally be noted that Vantage's duty was even greater than in the cases discussed above. A duty to warn is heightened proportionally with the operator's promises in their marketing materials to care for its patrons. In Stevenson v. Four Winds Travel, Inc., 462 F.2d 899 (5th Cir. 1972), Defendant's brochure stated:

> "Four Winds also guarantees that every tour will be escorted by a qualified professional tour director. Our tour directors have been carefully selected and trained * * *.

> "In order to insure the best possible personal service, Four Winds tour groups are limited to not more than 28 members.

> "Your escorts (tour directors) are also informative, they know precisely *what you will be seeing and doing every day. * * ** they've been there before." (Italics ours.)

> The brochure also stated that Four Winds guaranteed that each tour would be "fully escorted from start to finish."

> The authority and duties of Ceijas as tour director were very broad. Four Winds admitted in its answer to Stevenson's Interrogatory No. 3: "The Tour Director assumes management of all matters pertaining to his tour."

20

The brochure further stated:

> "From the moment you leave until your journey ends, *you are cared for* by a carefully selected Four Winds Tour escort." (Italics ours.)

Based on these representations, the Court in <u>Stevenson</u> held as follows:

> in view of all the emphasis that Four Winds put in its brochure on its tour escorts or directors-their careful selection, training and experience, and the many services they would render to members of their tours, that Stevenson had the right to expect that Ceijas would warn her of any danger like the slippery condition of the pier walkway and caution her to use extraordinary care to guard against the peril of such a condition

As discussed in the Statement of Facts, Vantage promised "Vantage Program Managers", who were experts, that would be with its patrons every step of the way, and would provide local knowledge. Plaintiffs' Declarations show that it was specifically because Vantage was going to be taking care of them that they decided to pay premium money, and go on this trip to a foreign country they had never been to. Vantage did not live up to its side of the bargain, thus violating their fiduciary duty to Plaintiffs.

### 5. Instead of Warning of the Prevalence of <u>Pickpocketing, Vantage did the Opposite</u>

Instead of warning their patrons, Vantage actually did the opposite. Vantage's Guide stated that "Although incidents of theft and pickpocketing while on tour are rare, it is important to be cautious and aware" (Exhibit 6, p. 30). This statement created a false sense of security. Indeed, pickpocketing in European countries, and Baltic countries in particular, is not rare at all. U.S. State Department warnings specifically warn against the heightened risk of pickpocketing (Exhibits 4-5). Additionally, Latvia's own database indicates that property theft is by far the most prevalent crime in the country (Exhibit 19).

### 6. Failure to Sustain Initial Burden as Movant for Summary Judgment in Showing that Hazards on Bridge was Not Reasonably Obtainable

As described at length above, Defendant had a duty to disclose to Plaintiffs reasonably obtainable information regarding hazards and dangers on the subject bridge, including potential criminal conduct. This was Defendant's duty, and it encompassed both 1) researching reasonably obtainable information, and then 2) relaying material information learned.

In moving for summary judgment, it was Defendant's burden to show what measures were taken to learn of reasonably obtainable information. Without showing what Defendant did, or what it actually did know, Defendant cannot possibly sustain its initial burden as movant of showing they did not know and could not reasonably expected to know of criminal activity on the bridge.

All Defendant has even begun to show is that they may have looked at the reputation of the hotel itself. But, this incident did not happen at the hotel, nor the area surrounding the hotel. Instead, it happened in an area that Defendant knew it was going to be advising Plaintiffs to walk across to go to and from dinner in the Old Town nearby. Additionally, in their response to Plaintiff's First Request for Interrogatories (Exhibit 16, # 8), Vantage admitted it "does not know of any specific investigations of any hazards or dangers of the bridge". In Defendant's Response to Plaintiffs' Second Request for the Production of Documents (Exhibit 17, # 5-7), Vantage admits it "did not look at U.S. State Department warnings, and has no documents regarding any investigation done".

Therefore not only has Defendant failed to meet its burden, it has shown it could not possibly meet its initial burden, as Vantage did nothing to obtain even reasonably obtainable information regarding security in the area surrounding the hotel. This was a clear violation of

22

their basic duty as Plaintiff's fiduciary.

### C. Second Theory of Liability: Vantage Vicariously Liable for Irene Nikolashina Affirmatively Advising Tourists that Walking on the Bridge was Very Safe

#### 1. Affirmative Negligence of Irene Nikolashina

New York Courts have recognized that tour operators can be found negligent for directing tour participants to proceed in a manner that affirmatively places a participant in a more vulnerable position than they would have otherwise been in. In Cohen v. Heritage Motor Tours, Inc., 205 A.D.2d 105, 618 N.Y.S.2d 387 (2nd Dept. 1994)[4], Plaintiff was injured while traversing a brook via a slippery stone stepping path. The case reveals that the following (emphasis added):

> [Plaintiff] was injured when she fell on stepping stones while traversing a running brook. The plaintiff claims that [The tour director] went to the brook and, with a wave of her hand, directed the group to follow her across the water by means of the stepping stone path. ... She relied on [the tour guide] to guide her as she had throughout the tour, although admittedly she was not compelled to cross the brook. The stones were allegedly slippery and dangerous, causing the plaintiff to fall. ... What distinguishes this case from those setting forth general rules of liability of tour operators and travel agents is that here the tour was led by an employee of the tour operator who allegedly **directed the participants to proceed in a particular manner**. An individual who assumes a duty may be held liable for a breach of that duty if the individual's conduct placed the injured party in a more vulnerable position than if the obligation ... had not been assumed ... If [the tour guide] directed the tour participants to follow her across the stones, she assumed a duty to exercise reasonable care since it is claimed that tour participants relied on her to guide them. The plaintiff's evidence raises a sufficient factual question as to whether [the tour guide] owed such a duty and exercised reasonable care under the circumstances.

Cohen is directly on point here. Plaintiffs discussed the safety of the bridge with Ms. Nikolashina, the Program Manager, after she advised that Plaintiffs go to the Old Town for dinner. Plaintiffs specifically asked whether it was more advisable to walk or take a car.

---

[4] This case was recently relied on in Maraia v. Church of Our Lady of Mount Carmel, 36 A.D.3d 766, 828 N.Y.S.2d 525 (2nd Dept. 2007).

Plaintiffs were directly told that walking was "very safe", and were never advised that taking

cars would in any way be any safer. Therefore, as in <u>Cohen</u>, Plaintiffs were directed to proceed

in a certain manner, and did so, all at the direction of their directors, which caused them to

become injured.

### 2.  <u>Vantage Estopped from Arguing Irene Nikolashina was Not its Employee</u>

In advising that the bridge was "very safe", Ms. Nikolashina was acting within, and in

furtherance of, her duties as a Vantage Program Manager. Therefore, Vantage is vicariously

liable for Ms. Nikolashina's negligence. <u>Brown v. Poritzky</u>, 30 N.Y.2d 289, 332 N.Y.S.2d 872

(1972) ("a principal is vicariously liable for the torts committed by his agent in the course of the

employment").

As described in the Statement of Facts, Vantage held Ms. Nikolashina out as their

employee. They advertised her in their website, they referred to her as "Our Program Manager"

and repeatedly referred to program managers as "Vantage Program Managers", and she wore

Vantage paraphernalia, without ever directly disclosing that she was not an employee. As

described in their Declarations, Plaintiffs relied on this representation (Exhibit 1 and 2).

Where an entity holds someone out as their employee, the entity is estopped from

disclaiming such relationship. The Court of Appeals in <u>Miles v. R & M Appliance Sales, Inc.</u>, 26

N.Y.2d 451, 259 N.E.2d 913, 311 N.Y.S.2d 491 (1970) explained this principle as follows:

> The principle of ostensible agency applies to hold an entity liable
> for the negligence of an independent contractor where the services
> of the independent contractor are "accepted in the reasonable belief
> that the services are being rendered by the employer or by his
> servants".

The matter of <u>Rovinsky v Hispanidad Holidays</u>, 180 A.D.2d 673, 580 N.Y.S.2d 49 (2nd Dept.

1992) applied this principle in the context of a tour agency, when a passenger was injured aboard

an independently owned and operated bus. In <u>Rovinsky</u>:

> a disclaimer in its brochure provides that Hispanidad shall not be
> liable for any injuries connected with any transportation. The
> defendant also claimed that it never owned buses or employed staff
> in Spain, and that the subject tour bus was owned and operated by
> an independent contractor. As a result, the defendant argued that it
> could not be held liable as a matter of law because it had no control
> over the bus or its driver.

However, the agency held the bus operation out as its own, as the case explains:

> Hispanidad's advertising brochure distributed to the public depicts
> a photograph of a deluxe tour bus bearing the Hispanidad name,
> with the caption "OUR MOTORCOACHES". The brochure
> further provided that the tours included "carefully chosen
> sightseeing excursions and guides, plus experienced and friendly
> personnel to serve you both here and in our offices in Spain". The
> plaintiffs maintain that they relied on several representations in the
> defendant's brochure which led them to believe that Hispanidad
> Holidays owned and operated their own fleet of safe buses
> operated by their experienced staff in Spain.

Based on these representations the Court found triable issues of fact of whether the brochure
circulated by the defendant constituted "a holding out to the public which would estop it from
disclaiming liability for the negligence of the independent contractor who owned and operated
the subject bus".

Similarly, in <u>Jacobson v Princess Hotels Intl.,</u> 101 A.D.2d 757, 475 N.Y.S.2d 846 (1st
Dept. 1984), triable issues of fact of an entity's operation of a hotel (that it now claimed was not
part of its chain) were raised when the chain's brochures and materials:

> ...make reference to the seven Princess hotels and facilities, using
> the following possessive phrases: "our hotels", "our sister hotel,
> the Acapulco Princess", "our fourteen outdoor courts", "our seven
> pools", "our twelve bars, lounges, disco and nightclub", etc. The
> advertising material conveys the apparently desired impression of
> an integrated Princess organization, quite opposite from the
> portrait of independence which defendants, with far less candor
> than one might expect.

Paraphernalia itself has also been found to imply agency. <u>Stone v. Pacific Delight Tours</u>, New York Law Journal, Dec. 27, 1978, p. 1, col. 4 (N.Y. Sup. 1978 ) (liability of domestic tour operator based upon Pacific Delight button worn by foreign tour operator).

Massachusetts law holds similarly. <u>Brooks Place Properties, LLC v. Dimaria</u>, 30 Mass.L.Rptr. 147 (Mass. Super. 2012):

> Vicarious liability creates liability in the principal for the acts of its agent …To prove vicarious liability, the plaintiff must first establish a master-servant relationship, either through an employer-employee or principal-agent relationship, at the time of injury. … In the absence of actual agency, vicarious liability may still be imposed when there is apparent agency. … apparent agency occurs when the principal's conduct causes a third party to reasonably believe that a particular person is the principal's agent.

See <u>Kansallis Finance Ltd. v. Fern,</u> 421 Mass. 659 (1996) ("[w]here the authority is only apparent, vicarious liability recognizes that it is the principal who for his own purposes found it useful to create the impression that the agent acts with his authority, and therefore it is the principal who must bear the burden of the misuse to which that appearance has been put").

Since Vantage clearly held Ms. Nikolashina out as being their employee, and Plaintiffs relied on that representation, Vantage is estopped from disclaiming the relationship.

## D. **There is No Waiver of Liability**

Defendant's motion argues that due to language in the Terms and Conditions on Plaintiff's invoice, Plaintiffs have waived their right to sue. This is not the case.

### 1. **Failure to Plead Waiver/Release as an Affirmative Defense**

In order for this argument to even be raised in a summary judgment motion, Defendant was required to plead it as an affirmative defense in its Answer. <u>Federal Rules of Civil Procedure Rule § 8</u> ("Affirmative Defenses … In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: … release … waiver"). Defendant's Answer

26

contains no such affirmative defense. Consequently, Defendant is precluded from arguing same herein.

### 2. **Clause Ambiguous**

The clause merely states that Defendant is not responsible for "criminal activities", but does nothing to define what a criminal activity is for purposes of the agreement. As these terms were not bargained for, and were entirely drawn up by the Defendant, every ambiguity is held against the Defendant. Quirk v. Walker's Gymnastics & Dance, 16 Mass.L.Rptr. 503 (Mass.Super. 2003). ("any doubts about the interpretation of [a] release must be resolved in the plaintiff's favor"). Here, the entire phrase is so unclear that it cannot possibly hold any legal weight whatsoever,

### 3. **Clause Does Not Cover Vantage's Own Negligence**

At most, the clause can only be understood to not make Vantage responsible for the criminal acts of another. However, nowhere in the Terms and Conditions does Vantage ever call for a release from liability for damage caused by its *own* negligence.

This type of distinction was upheld in Miller v. Group Voyagers, Inc., 912 F.Supp. 164 (E.D.Pa. 1996). In Miller, a travel agency arranged for Plaintiffs to stay at a hotel. Plaintiff entered into an agreement that it would not hold Defendant liable "for harm caused by any act or omission of any supplier providing tour services or of any other person." While at the hotel, Plaintiff "contracted scabies as a result of the unsanitary condition of her hotel room", and burglars broke into her room and stole money. Plaintiff contended that Defendant "failed to ensure that the accommodations it arranged for its clients were reasonably clean and secure, thereby causing the plaintiffs' harm and loss." Defendant moved for dismissal based on the agreement releasing them from liability. The Court in Miller held:

> The first flaw in this line of argument is that the limitation clause does not cover the situation in which Globus itself is negligent. Instead, the clause covers harmful acts or omissions on the part of either those providing tour services or other persons, but does not exempt Globus when the alleged tortfeasor is Globus itself.

The Court in Cooke v. Allstate Management Corp., 741 F.Supp. 1205 (D.S.C. 1990) also upheld this dichotomy. In Cooke, a lease signed by Plaintiff provided that Plaintiff's landlord would not be liable for:

> any loss, injury or damage to person or property ... arising out of the failure of any appliance ... or caused by any casualty or catastrophe including without limitation ... criminal acts, or from any other cause whatsoever, whether or not due to negligent acts or omissions by You, your family and guests or by any third parties, including without limitation other occupants of this apartment, and you assume all risk and agree to indemnify Us from any such loss, injury, or damage.

Subsequently, "an intruder entered [Plaintiff's] apartment through the sliding glass door to the balcony. Plaintiff alleges that the attacker was able to reach the balcony of her second floor apartment by using a ladder negligently left nearby by the landlord. The Court held as follows (emphasis added):

> A close reading of the clause reveals that the clause does not explicitly exculpate defendant from liability for its own allegedly negligent acts. The clause does mention the negligence of the lessee and of third parties, while glaringly omitting any reference to the negligence of defendant. **Although it does mention criminal acts, the clause does not tie those criminal acts to any negligence of defendant.** Because this is a form contract, plaintiff did not have equal bargaining power, and most importantly, the clause does not explicitly include the negligent acts of defendant, this clause does not bar plaintiff's negligence claims.

### 4.   Matter of Dorkin Easily Distinguishable

Defendant would like the Court to believe that Dorkin v American Express Co., 43 A.D.2d 877, 351 N.Y.S.2d 190 (3rd Dept. 1974) is directly on point. This is not the case. The

contract in <u>Dorkin</u> was clear that Defendant was not going to be providing for Plaintiff's safety at all ("Defendant agreed to supply plaintiffs with a planned European tour with meals, lodging and transportation. It did not, however, insure the safety of plaintiff. The disclaimer in the tour contract negates any intent of defendant to assume a contractual obligation for such safety"). The present contract does not say that at all. Beyond that, the Dorkin Court does not mentioned exactly what the disclaimer at issue was, but we know that in the present matter, the scope of the alleged release was for "criminal activity", and the cases above make it clear that is not effective against a party's own negligence.

Based on the arguments made above, it is submitted that Defendant's motion for summary judgment should be denied in its entirety.

Dated: April 13, 2015
      New York, New York

                     RHEINGOLD, VALET, RHEINGOLD,
                     MCCARTNEY & GIUFFRA LLP
                     Attorneys for Plaintiffs

                     By: _____
                           Thomas P. Giuffra (1274)
                     113 E. 37th Street
                     New York, NY 10016
                     Tel: (212) 684-1880
                     Fax: (212) 689-8156
                     tgiuffra@rheingoldlaw.com

To:

James W. Weller, Esq.
NIXON PEABODY LLP
Attorneys for Defendant
50 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel: (516) 832-7500
jweller@nixonpeabody.com