UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT J. GIUFFRA and MARY GIUFFRA,<br><br>         Plaintiffs,<br>-against-<br><br>VANTAGE TRAVEL SERVICE, INC. d/b/a VANTAGE DELUXE WORLD TRAVEL,<br><br>         Defendant. | Case No.: 13-cv-6880 (KBF)<br><br>**DECLARATION OF<br>ROBERT GIUFFRA**<br><br>Docket No.: 53 |

  Robert J. Giuffra, pursuant to 28 U.S.C. § 1746, deposes and declares that the following is true under penalties of perjury:

1. I am a Plaintiff in this matter, and submit this Declaration in opposition to Defendant's motion for summary judgment.

2. I am an attorney at law duly licensed to practice in the State of New York. I have been licensed in New York since 1954.

3. I have been a member of the bar of the Southern District of New York since 1957.

4. I practiced as an attorney specializing in the defense of maritime, products liability and general negligence actions. I had practiced full time as an attorney in New York since I returned home from overseas service with the United States Army in the Korean War. My career as an attorney ended after I sustained serious injuries while the victim of pickpocketing in Riga, Latvia.

5. I was born on August 28, 1930 in Brooklyn, New York. My wife, Mary J. Giuffra and I have been married since 1959. We have raised four children.

6. Since we were first married, Mary and I have divided responsibilities as a couple. I have been responsible for financial matters, management and maintenance of our home. One of Mary's roles has been planning and booking our family vacations. As a two career family, we

shared the responsibilities of raising our children.

7.    During our married life, we have travelled to a number of different countries both as a couple and with our children. However, as we became older we transitioned from independent travelers to travelers who required escort. There were multiple reasons for this change in our travel habits. As our children started their own families and no longer vacationed with us, we began travelling more frequently outside of the Unites States which was not familiar to us. As older people, we believed that the responsible and safe thing to do was to pay for a tour which would tend to the details of our travels, book our hotels and provide us with an escort who was knowledgeable about local conditions.

8.    Escorted travel was our only means of international travel with the exception of our visits to Paris to visit our daughter who resides there. While in Paris, our daughter would act as our guide. We have taken cruises. However, all onshore excursions were conducted with a guided escort.

9.    I had no role in arranging or booking our tour to Riga, Latvia. My wife made all decisions and arrangements pertaining to the tour. Neither Mary, nor myself had ever visited the Baltic States.

10.   I had no prior knowledge about Riga, Latvia prior to visiting. Prior to our trip, I undertook no research of the conditions existing in Riga. I did not purchase or read any guidebooks or information pertaining to Riga.

11.   My wife, Mary Giuffra, made all of the arrangements with Vantage for our trip to the Baltics. I had no role in planning the vacation other than to pack a bag and get on the plane.

12.   We had previously utilized Vantage for another tour. We were well satisfied with the services offered by Vantage. I do recall that the guide on the prior trip appeared to be local and

advised us of specific issues pertaining to safety.

13.    At the time I arrived in Riga, I had no idea what the safety situation was. I trusted our Vantage guide to provide information which could impact our health and safety.

14.    Irene Nikolashina was our guide for the entire length that I was on tour.

15.    During the trip, Ms. Nikolashina wore Vantage apparel that indicated she was from Vantage. Never did she ever tell us that she was employed by some other company, nor did her apparel indicate this. She also spent time recruiting people to go on future Vantage trips while on our trip.

16.    At all times on this trip, we understood Ms. Nikolashina to be an employee of Vantage. We were actually stunned to learn that Vantage would say otherwise in the course of this lawsuit. Ms. Nikolashina gave us every indication to think that she was employed by Vantage, and never did she or anyone else ever give us any indication otherwise.

17.    I was aware that we needed to take care while travelling in the Baltic. However, I was never advised by Irene that pickpocketing was the major problem confronting tourists in Riga. In fact, Irene advised us that Riga was a safe city.

18.    Based on our respective ages, my wife and I take steps to ensure our personal safety. Paramount among them is to ask our guides about safety concerns in our destinations. When we are given information that is a concern we act on it.

19.    For example, when we were travelling in Istanbul, a recommendation was made to us by a fellow traveler to visit the area around the Blue Mosque at nighttime. We asked our tour guide whether this was a safe area for two elderly Americans to walk at nighttime. The guide advised us that while this area was safe during the day, at night there was significant risk from undesirable elements. As a result of this advice, we remained in our hotel at night.

20. When we arrived in Riga, we did a local tour on a bus. Ms. Nikolashina escorted the tour. On July 14, 2012, we had a free afternoon and evening. Ms. Nikolashina recommended that my wife and I go to Old Town for dinner. Our hotel was located across the river from Old Town and entailed a walk of approximately 1/4 - 1/2 of a mile.

21. We asked Ms. Nikolashina whether it was safe to walk across the bridge as we were in an unfamiliar country and as elderly American tourists we frankly stood out from the locals. Ms. Nikolashina assured us that it was "very safe" to walk on this bridge. Based on the information we received from somebody we thought had specialized local knowledge we decided to cross the bridge for dinner.

22. We had no reason to doubt Ms. Nikolashina at the time, and felt safe because she told us we should. Had we been made aware of the pickpocketing problem in Riga, we would not have gone across the bridge unescorted. This type of action would have been completely contrary to the manner in which we have travelled internationally for at least twenty years.

23. My wife and I crossed the bridge without incident and had dinner in Old Town with another couple from the Vantage tour. On the return trip, while I was walking down a covered passageway leading to the street, an unknown man stole my wallet and threw me down a flight of stairs causing me to sustain significant head and orthopedic injuries.

24. I have no specific memory of what occurred at this time as I sustained a head injury and lost consciousness. My last memory is feeling somebody's hand in my wallet pocket. Much of the information I have about the assault and my subsequent hospitalizations in Riga and Stockholm is based on what my family has told me.

25. I was not aware that there was any other method for walking on the bridge to the hotel. The way we walked was the only way I understood we could go to get to the hotel. I have now

been told that there was an alternative method that would have avoided the covered passageway where I was attacked, but I was not aware of it at the time, and did not see any other method for getting to the hotel.

26. Following the robbery, I was taken by ambulance to a hospital in Riga. I have no memory of my time in the hospital. I was airlifted to a hospital in Stockholm, Sweden, where I underwent an open reduction surgery on my femur and received treatment for a traumatic brain injury. My time in Sweden is frankly a blur. I returned to New York after being hospitalized for over two weeks in Sweden. I was accompanied on a commercial aircraft by a medical doctor. I was then admitted to NYU Medical Center for a period of weeks where I received further treatment for my injuries. Thereafter I was admitted to Cabrini Rehabilitation Hospital in Dobbs Ferry, NY.

27. I attempted to return to the full time practice of law. Unfortunately, I discovered that I am no longer physically able to do so.

28. I commenced this lawsuit on my behalf, but discovered that I was no longer able to effectively practice the profession I had enjoyed for over fifty years with the same degree of skill. Thereafter, I asked my son to act in my stead.

29. The events that occurred in July 2012, have completely changed my life for the worse. I am no longer able to do the job I loved and I feel like I am an invalid.

30. I have discovered that prior to sending my wife and I to Riga, Vantage undertook no efforts to ensure that we were safe and located in a safe area. My son recently showed me several Vantage emails which indicated that the bridge was the site of 10-15 muggings per month. I also have learned that the main problem confronting tourists in Riga is pickpocketing.

31. My wife and I were never told of the extent of the pickpocket problem in Riga. Had we been made aware of this we would never have gone anywhere without our guide.

I declare under penalties of perjury that the foregoing Declaration is true and accurate.

Dated: Bronxville, New York
      April 10, 2015

_____
ROBERT GIUFFRA